# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

NATHANIEL J. BROUGHTY,

              Plaintiff,

       v.

CHRISTOPHER E. BOUZY,

              Defendant.

Civ. Action No. _____

**NOTICE OF REMOVAL**

Removed Proceeding:
New Jersey Superior Court
Law Division, Hudson County
Docket No. HUD-L-003607-22

To:    William T. Walsh, Clerk of Court
       United States District Court for the District of New Jersey
       Clarkson S. Fisher Building & U.S. Courthouse
       402 East State Street
       Trenton, NJ 08608

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Christopher E. Bouzy, by and through the undersigned counsel, hereby removes this case, bearing docket number HUD-L-003607-22, from the Superior Court of New Jersey, Law Division, Hudson County, to the United States District Court for the District of New Jersey.  In support, Defendant states as follows:

## BACKGROUND

1.      On October 28, 2022, Plaintiff Nathaniel J. Broughty filed a Complaint against Defendant Christopher E. Bouzy in the Superior Court of New Jersey, Law Division, Hudson County (the "State Court"), bearing docket number HUD-L-

003607-22 (the "State Court Action").   A true and correct copy of Plaintiff's Complaint ("Compl.") is attached as **Exhibit A**.

2.      Plaintiff has not served Defendant with the Complaint or Summons.

## BASIS FOR REMOVAL

### Jurisdiction

3.      Removal of this matter is proper under 28 U.S.C. §§ 1332 and 1441(b), which authorize removal of any civil action between "citizens of different States" in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs." 28 U.S.C. § 1332(a)(1).

4.      The United States District Court for the District of New Jersey has jurisdiction over the State Court Action, pursuant to 28 U.S.C. § 1441(b), because there is diversity of citizenship, the amount in controversy exceeds $75,000, and Defendant, who is a resident and citizen of the State of New Jersey, has not been "properly joined and served."  28 U.S.C. § 1441(b)(2).

### Diversity of Citizenship

5.      Upon information and belief, and based on the allegations of the Complaint, Plaintiff, an individual, is a citizen of the State of New York.  The Complaint alleges that he is a former New York police officer, a "member of the New York bar, and a former Bronx County District Attorney."  Ex. A, Compl. ¶ 1. Attorney records maintained by the New York State Unified Court System identify

his address as 92 Saint Nicholas Ave., Apt. 2E, New York, NY, 10026-2934.  A true and correct copy of that record is attached hereto as **Exhibit B**.

6.     Defendant, an individual, is a resident and citizen of the State of New Jersey.  *See* Ex. A, Compl., ¶ 5.

7.     Although Defendant is a citizen of the State of New Jersey, he has not been served with a Summons and the Complaint in this action.  Thus, Defendant is not a forum defendant "properly joined and served" under 28 U.S.C. § 1441(b)(2).  *See Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152-54 (3d Cir. 2018) (affirming removal of case under 28 U.S.C. §§ 1332 and 1441(b) where the forum defendant filed notice of removal prior to service of process).

## Amount in Controversy

8.     Plaintiff brings claims against Defendant for defamation per quod, defamation per se, false light, and intentional interference with prospective business advantage.  *See* Ex. A, Compl., ¶¶ 111-31.

9.     Plaintiff seeks compensatory and punitive damages, injunctive relief, and an award of attorney's fees and costs.  *See id.* at 31-32 (*ad damnum* clause).

10.     The amount in controversy requirement is satisfied because, although the Complaint does not plead a specific amount of damages, Plaintiff is presumptively seeking an amount in excess of $75,000 based on his claim for punitive damages and attorney's fees and costs.  *See, e.g., Raspa v. Home Depot*,

533 F. Supp. 2d 514, 516 (D.N.J. 2007) (denying motion to remand, even though "[i]n the Complaint, Plaintiffs do not state the exact sum that they are seeking," where plaintiffs "are seeking punitive damages, which must be considered when calculating the amount in controversy," as well as "attorney's fees, which can be significant").

11.     Without conceding the availability of any particular remedy or category of damages, this action involves citizens of different States, and, based on the allegations of Plaintiff's Complaint, the amount in controversy exceeds $75,000. Accordingly, this action is one over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## Venue

12.     Under 28 U.S.C. § 1441(a), the District of New Jersey is the proper venue for removal (and Newark is the proper vicinage) because this suit is pending in the New Jersey Superior Court, Law Division, in Hudson County, which lies within this District.

## Procedural Requirements

13.     This Notice of Removal is signed pursuant to Federal Rule of Civil Procedure 11. *See* 28 U.S.C. § 1446(a).

14.     As required by 28 U.S.C. § 1446(d), Defendant is serving a copy of this Notice of Removal on Plaintiff's counsel and filing a copy of this Notice of Removal

with the State Court.  A true and correct copy of that Notice of Filing (without exhibits) is attached as **Exhibit C**.

15.     No proof of service on Defendant appears on the State Court docket.

16.     By filing this Notice of Removal, Defendant does not waive his right to assert any defense to Plaintiff's claims, including, without limitation, those relating to service of process, personal jurisdiction, and/or failure to state a claim upon which relief may be granted. No admission of fact, law, or liability is intended by this Notice of Removal, and all defenses, motions, and pleas are expressly reserved.

17.     This Notice of Removal is timely as the 30-day time period set forth in 28 U.S.C. § 1446(b)(1) has not expired, as the Complaint was filed on October 28, 2022, and has not yet been served on Defendant.

18.     Based on the foregoing, this Court has jurisdiction pursuant to 28 U.S.C. § 1332, and this matter may be removed to this Court under 28 U.S.C. § 1441.

## CONCLUSION

WHEREFORE, notice is respectfully given that this action is removed from the Superior Court of New Jersey, Law Division, Hudson County, to the United States District Court for the District of New Jersey.

Dated: November 4, 2022                    */s/ William P. Reiley*
                                          William P. Reiley (128872014)
                                          Ballard Spahr LLP
                                          A Pennsylvania Limited Liability Partnership
                                          700 East Gate Drive, Suite 330

Mount Laurel, NJ 08054-0015
reileyw@ballardspahr.com
Tel: (856) 761-3465

*Counsel for Defendant Christopher E. Bouzy*

# Exhibit A

Ronald D. Coleman
Josiah Contarino
DHILLON LAW GROUP, INC.
A CALIFORNIA PROFESSIONAL CORPORATION
50 Park Place, Suite 1105
Newark, NJ 07102
973-298-1723
rcoleman@dhillonlaw.com
*Attorneys for Plaintiff Nathaniel J. Broughty*

| | |
|---|---|
| **NATHANIEL J. BROUGHTY**, <br><br> *Plaintiff,* <br><br> - *vs.* - <br><br> **CHRISTOPHER E. BOUZY**, <br><br> *Defendant.* | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION: HUDSON COUNTY** <br><br> **Docket Number:** <br><br> _____ <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Nathaniel J. Broughty, by his undersigned counsel, complains and states as follows:

## THE PARTIES

1.     Plaintiff Nathaniel Broughty is a former University Police Officer of the City New York, a member of the New York Bar, a former Bronx County Assistant District Attorney and former Law School Instructor who created and operates a YouTube channel under the name, "Nate the Lawyer," which can be found at https://www.youtube.com/c/NateTheLawyer (the "Nate the Lawyer Channel" or "the Channel").

2.     The purpose of the Nate the Lawyer Channel is to make the law more accessible to people.  Since its founding in 2014, the Nate the Lawyer Channel has collected over 27.6 million views.  It currently has approximately 255,000 subscribers.

3.      Defendant Christopher E. Bouzy is a serial failed entrepreneur and, in the opinion of many, a serial successful swindler. Bouzy is a resident of North Bergen, having an address at 5101 Meadowview Avenue.  He is the chief executive officer of Bot Sentinel, Inc., a domestic for-profit corporation of the State of New Jersey.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action because the defendant is a resident of the State of New Jersey and the conduct complained of took place in the State of New Jersey, causing harm to the plaintiff Nathaniel Broughty in this State.

5.      Venue is proper in Hudson County because the defendant is a resident of this County.

## FACTS APPLICABLE TO ALL CLAIMS

**<u>Livestreaming and "LawTube"</u>**

6.      The Nate the Lawyer Channel is best known for its "livestreams" and "videos on demand" which are transmissions of video and audio over the internet by channel hosts who attract viewers to their programs by virtue of expertise, personality, guest selection or other qualities.

7.      The Channel focuses on both pre-recorded produced videos and real-time live coverage of events of widespread interest, an increasingly popular form of livestreaming.

8.      One attraction of livestreaming is that it allows viewers to participate in the program through messages and interactions sent through chat screens. This running commentary is visible to all participants in a "chat window" shown next to the video window on a viewer's computer screen.

9.      A Super Chat is a paid message that, in exchange for a payment by the viewer, makes that viewer's chat comment more colorful and eye-catching—and more likely to be responded to by the livestream host—than ordinary comments. While new comments in the chat stream displace older comments, Super Chats are special and rise to the top of the chat window.

10.     The purchase amount determines the duration of the pinned comment. For a $5 payment, a Super Chat comment stays "stuck" on the chat screen for two minutes; larger amounts stay visible for longer. For less than $5, a comment still stands out but disappears as usual.

11.     Popular live streamers are able to generate significant income through Super Chats as well as other monetization mechanisms offered by YouTube.

12.     Through his work on the Nate the Lawyer Channel, plaintiff is part of an informal group of experienced lawyers with law-oriented YouTube channels who "livestream"—often as a group appearing on one channel—legal commentary and discussion often referred to as "LawTube."

13.     The "members" of YouTube are highly diverse in terms of seniority, legal specialty, political viewpoint, race, religion and sex.

14.     As described in a May 26, 2022 article in the *Los Angeles Times*, livestreams of sensational trials accessible to in-court cameras, such as the November 2021 criminal trial of Kyle Rittenhouse, have become a new and arguably dominant way for Internet users to watch these live trials.

15.     As a result, and as described in the same article, such livestreams represent important opportunities for LawTube streamers to realize significant growth in their subscriber, viewership and engagement measures.  These in turn have the potential to increase the prominence of a given streamer's channel, such as through enhanced search results, as well as to generate revenue.

16.     Livestreams by LawTubers and other livestreamers depend for their popularity in large part on how potential viewers perceive their host's experience, professional knowledge and, above all, credibility.

**The Johnny Depp / Amber Heard Trial**

17.     Following on the success of the LawTubers' coverage of the Rittenhouse trial, the group coalesced around coverage of the sensational defamation trial that pitted movie star Johnny Depp against his former wife, the actress Amber Heard.

18.     Depp's defamation claim was based on her publication on the *Washington Post* opinion page of claims that she was physically abused by Depp.  Depp prevailed at trial.

19.     As the case ramped up toward a verdict, however, a celebrity-obsessed public was riveted by the scandalous nature of the claims by such high-profile entertainers combined with the normally strong appetite for legal drama.

20.     To some extent, however, public sentiment concerning the case divided along political and cultural lines because Heard's claims represented a high point in the sway of the "#MeToo Movement," a social trend that focused attention on the widespread abuse of women by men in positions of power and influence, especially in the entertainment field.

21.      Indeed, the trial was described by many commentators as a tipping point in a battle between extreme poles that had formed around the #MeToo movement. The *Washington Post*, for example, printed a column in June stating,

> Dixon was alarmed by the "giddy derision" that seemed to follow Heard, in particular. She had hoped to avoid the trial altogether, but when her 17-year-old daughter showed her a pro-Depp meme despite not knowing much about him prior to the trial, Dixon realized how much it had permeated popular culture. The live-streamed trial was widely followed by observers online, and social media was overwhelmed by Depp fans who felt he could do no wrong.

> While 'believe women' never became the rallying cry some wanted it to be, more women began to believe they would be believed. Many experts in the fields of gender

discrimination and domestic violence, however, fear that the Depp v. Heard verdict — and the online harassment of Heard in the trial leading up to it — could shake the confidence of women who might have otherwise come forward with allegations of abuse, and slow or reverse the momentum created by #MeToo.

22.     Similarly, the *Hollywood Reporter* wrote, "At the height of the Time's Up movement, stars rallied in support of women during high-profile cases against the likes of Harvey Weinstein and Bill Cosby. The absence of such solidarity today has some #MeToo proponents worried about the future of the movement."

23.     These concerns about "solidarity" were well taken, as demonstrated by the running commentary from members of the LawTube "panel."  Notwithstanding the diversity of political and cultural perspectives among members of the group, as the trial wore on the virtually unanimous opinion among the LawTube was that the harsh glare of courtroom, and the skill of Depp's legal team, had left Heard's credibility, appeal and chances in tatters.

24.     The sentiments were well represented by a description of a moment reported in the *Los Angeles Times* article cited above during LawTuber Emily D. Baker's livestream of the Depp-Heard trial to her live 128,000 viewers.

25.     The purple-haired Baker is a seemingly natural ally of the #MeToo advocates, having told the *Times* reporter, "I hope that as a female attorney streamer that has worked in the criminal context, I can bring not just sensitivity to the topic but also asking the appropriate questions if the evidence doesn't match the testimony in the most compassionate way possible. There's just a way to have that conversation without being hateful."

26.     Baker was not, however, prepared to go beyond empathy and sensitivity to giving her viewers her straight take regarding Heard's, and her lawyer's, performance in the courtroom, as described in the article:

> Emily D. Baker is exasperated. In the penultimate week of Amber Heard and Johnny
> Depp's defamation trial, Baker at times rises from her seat in her home studio or fans

herself with a small blue book of the federal rules of evidence as she delivers a steaming critique of Heard's attorney Elaine Bredehoft.

"This is preposterous, Elaine! You don't do speaking objections," Baker, 44, seethes as red lights flash to indicate another thousand subscribers have signed up to her channel. A so-called super-chat message flashes across the screen from a viewer who paid $10 to let the audience know she thinks the judge is being too easy on Bredehoft. "This is a mess, and the jury is going to see it's a mess," Baker adds.

27.     Baker was right, as were the other LawTubers: The jury returned a verdict of $15 million for Depp.

**Christopher Bouzy: Serial Entrepreneur**

28.     On his personal website, ChristopherBouzy.com, Bouzy describes himself as a "serial entrepreneur, software engineer, and political maven. . . . . Words cannot express the feeling you get when building a product with a keyboard and mouse and then release it to the world for millions of people to use."

29.     On information and belief, defendant Bouzy is not a software engineer. His LinkedIn profile does, however, describe him as having been employed as a computer service technician for the New York City Department of Education from September 1998 through November 2000.

30.     On information and belief, defendant Bouzy has never "released" a "virtual product" that has been used by millions of people. A previous company of his called Komcore, however, did release four programs—"WalletCloak," a system for encrypting and hiding cryptocurrency wallets; "Music Chow," a free music downloading application; "Bytecent Bounty," a "fun and easy way to discover new apps and games while getting rewarded!"; and Bytecent, "the first peer-to-peer rewards network powered by blockchain technology"—which, by every indication, have all been used by virtually no one.

31.     Because he is a serial entrepreneur, Bouzy's Komcore was not his first failed venture. That distinction belongs to Insight Concepts, Inc. which in 2003 issued a press release making the following astounding claims:

THE NEW FACE OF SOFTWARE

New York-based company Insight Concepts redefines the term: "Unique Software".

(PRWEB) AUGUST 31, 2003

Today Christopher Bouzy, the CEO of Insight Concepts announced that the company is weeks away from releasing software that will successfully determine if a person is telling the truth or not. The company has completely designed the software for the average home user, and boasts if you can click the mouse then you can use the software. Software Engineers from the company claim the software can effectively detect slight anomalies in the human voice when someone is lying or telling the truth, and the software has an 90-95% success rate. While some experts question the morality of using such software, two-thirds of the 1,500 Americans surveyed say they would use the software at least once.

"In the back of everyone's mind we often wonder if the person we are dating has something to hide. This software now gives a person the ability to finally determine if their partner is being completely honest," says Christopher.

The 28 year old CEO started the company in 2000 to develop software other developers were not interested in developing. Insight Concepts has made its success developing less than common software for the home and business consumer, and the company has reported an annual gross profit of $3.5 Million in download and CD-ROM sales. The company recently released a new version of their award winning software Cloak. Cloak is a steganography/encryption application that allows users to encrypt and hide files within image files. I was permitted to take Cloak for a test drive, and I was impressed with the 5 minute learning curve of the software. I was able to navigate through the steps and successfully encrypt a file without ever consulting the manual.

Given the excessive cost and limited features of traditional software, Insight Concepts offers a competitive alternative, at a lower price.

32.     Despite the claimed success of this unique, if not morally troubling, software release, Insight Concepts, Inc. was dissolved by the State of New York in June of 2004.

33.     Bouzy first achieved notoriety, however, operating another "crowdfunded" project: a cryptocurrency called BlackCoin.

34.     Shortly after joining one such forum, BitcoinTalk.org, in March of 2014, under the "IconicExpert" username, Bouzy introduced himself as a software engineer who was working with friends in the finance industry about a new product—specifically a non-reloadable, or single-use, cryptocurrency-based payment card to be called "Blackcoin."

35.     Shortly thereafter, IconicExpert started using the forum to solicit donations which he said would be used to help cover the costs of writing and distributing press releases to help support Blackcoin in the market, which he did again several weeks later.

36.     Two weeks later, at the end of April 2014, Bouzy again requested more crowdfunding, this time $12,000 to finance a "Wall Street" promotional event at which 50 women wearing branded t-shirts would hand out Blackcoin cards in the financial district.

37.     By early May, supporters, investors and purchasers of Blackcoin cards were turning against IconicExpert, who is accused of trying to control and censor the group, misstating his credentials and misusing donations. Despite claims by Bouzy that the actual cards had been "shipped," Bouzy has never disputed online claims that most purchasers never received them.

38.     Bouzy, however, refused to refund any money, and eventually walked away from the Blackcoin project, which subsequently recovered after the end of his involvement.

39.     Bouzy, being a serial entrepreneur, was also involved in controversy involving accusations of unethical "pumping"—otherwise known as "pump and dump" schemes—involving two other cryptocurrencies, Libertycoin and Bytecent.

**Bot Sentinel**

40.     In 2018, defendant Bouzy turned his attention and his crowdfunding away from cryptocurrency to social media.

41.     Although formed as a New Jersey for-profit operation, defendant Bot Sentinel solicits donations, stating on its website, "Bot Sentinel is a crowdfunded project, and if you want to help us continue our mission of making social media platforms safer, please consider contributing today."

42.     Bot Sentinel, however, is not only crowdfunded. It has been paid by some well-known clients like Megan Markle, Pete Buttigieg, Former FBI Lawyer Lisa Page and Amber Heard.

43.     It becomes obvious why Amber Heard engaged Bot Sentinel once the difference between what it claims to be, and what it is, is made clear.

44.     Bot Sentinel is a service Bouzy founded in 2018 that describes itself as "help[ing] fight disinformation and targeted harassment" on Twitter. "We believe," according to the service's website, that "Twitter users should be able to engage in healthy online discourse without inauthentic accounts, toxic trolls, foreign countries, and organized groups manipulating the conversation."

45.     Bot Sentinel describes itself as a "free non-partisan platform developed to classify and track inauthentic accounts and toxic trolls. The platform uses machine learning and artificial intelligence to classify Twitter accounts, and then adds the accounts to a publicly available database that anyone can browse."

46.     Bot Sentinel's claims for its technology—that is, its ability to detect and rank "bots" on Twitter—has been taken for granted by a number of non-technical publications, but others have raised significant questions about the application. While the name "Bot Sentinel" suggests that it flags automated Twitter accounts, known as "bots," the Bot Sentinel website itself explains its operation as follows:

> Bot Sentinel uses machine learning and artificial intelligence to classify suspicious Twitter accounts, and then we store those accounts in a database to track each account daily. We use the data we collect to understand how these accounts affect public discourse and how we can minimize their negative influence. Our team developed our machine learning model using 2500 ordinary Twitter accounts tweeting about politics, current news, and other various topics. We also used 2500 trollbot accounts we

identified by examining the text of their tweets. In total, we used a combined 5,000,000 tweets from ordinary and trollbot accounts to build our model.

47.     Notwithstanding the use of impressive "high-tech" terms such as "machine learning" and "artificial intelligence," much in the description set off above of what Bot Sentinel does hinges on an understanding of the term "trollbots"—a neologism coined by Bot Sentinel.

48.     On its website, Bot Sentinel defines "trollbots" as "human controlled accounts who [*sic*] exhibit toxic troll-like behavior. Some of these accounts frequently retweet known propaganda and fake news accounts, and they engage in repetitive bot-like activity."

49.     There is very little that is either actually high-tech or rigorous about this definition, including as it does such subjective and indeed highly contentious categories such as "toxic troll-like behavior," "propaganda," and "fake news."

50.     The same is true of the claim, in the original description, that the statistical baseline for normal or non-"trollbot" Twitter engagement was set by applying "machine learning" to a set of 2500 "ordinary Twitter accounts."

51.     In fact, notwithstanding numerous claims on its website that Bot Sentinel is "non-partisan," apolitical and unbiased, its reliance on vague, loaded and subjective terms suggests otherwise, and support the widely held view that Bot Sentinel is less concerned with "bots" than with political views.

52.     Indeed, the reliability of Bot Sentinel's usefulness as a Twitter "bot" detector has been dismissed by the one other entity in the best position to know:  Twitter.

53.     In a May 2020 blog post, Yoel Roth, Twitter's head of Safety & Integrity, and Nick Pickles, the company's director of Global Public Policy Strategy & Development, wrote as follows:

> There are . . . many commercial services that purport to offer insights on bots and their activity online, and frequently their focus is entirely on Twitter due to the free data we provide . . . . Unfortunately, this research is rarely peer-reviewed and often does not

hold up to scrutiny, further confusing the public's understanding of what's really happening.

. . .

What about tools like Botometer & Bot Sentinel?

These tools start with a human looking at an account—often using the same public account information you can see on Twitter—and identifying characteristics that make it a bot. So in essence, the account name, the level of Tweeting, the location in the bio, the hashtags used etc.

This is an extremely limited approach.

As mentioned, an account with a strange handle is often someone who was automatically recommended that username because their real name was taken at sign-up. An account with no photo or location may be someone who has personal feelings on online privacy or whose use of Twitter may expose them to risk, like an activist or dissident. Don't like to add much of a bio or your location to your account? Some of us at Twitter don't either. Even if all of these public details are put into a machine learning model to try to probabilistically predict if an account is a bot, when they rely on human analysis of public account information, that process contains biases—from the start.

Let's take some other everyday examples for clarity. Someone who Tweets 100 times a day with #SuperBowl could just be an extremely engaged individual who loves football (or hates it if their team is bad). If you care deeply about the environment and Tweet about it at a certain political moment when you and your friends want to make an impact, you're not "political bots"—you're active citizens organizing an organic online campaign to drive change in your community.

These tools do not account for these common Twitter use cases, how far we've come, and how things have evolved. As a result nuance can be lost. The outcome? Binary judgments of who's a "bot or not", which have real potential to poison our public discourse—particularly when they are pushed out through the media.

54.     Bot Sentinel, in other words, does not rely on "machine learning" or other technology any more than its creator, Christopher Bouzy, learned how to be a software engineer when he was repairing computers for the New York City Education Department. Bouzy did, however, learn how to employ catchphrases, techno-gobbledygook, sleight-of-hand, and a healthy dose of crowdfunding to throw up a cyber-smokescreen festooned with enough bells and whistles to enchant the untechnical and uncurious. This was and is Bot Sentinel.

55.     Bot Sentinel also rates Twitter accounts as either normal, satisfactory, disruptive or problematic. Bouzy claims, "The name Bot Sentinel means autonomous guard. In other words, we use a good 'bot' to help identify and guard against inauthentic accounts and toxic trolls. That also includes automated accounts that violate Twitter's rules. Bot Sentinel classifies a lot more than just bots."

56.     Because of this subjectivity, however, Bot Sentinel's ratings are widely inconsistent. For example, Bot Sentinel recently ranked the Twitter account **@Alexthe_a** as solidly "normal," as shown below at left, despite its documented and frequent use of "hate speech" and offensive epithets, as shown in the illustration below at right.




57.     At the same time, Bot Sentinel rated plaintiff's Twitter account **@natethelawyer**, which uses neither racial or other slurs or calls for violence or death against any person or ethnic group, "disruptive."

58.     On information and belief, Mr. Broughty's "disruptive" rating is based on little mor than the personal preferences, biases or agenda of defendant Christopher Bouzy.



59.     In other words, while Bot Sentinel gives the impression of rigorous, empirical analysis of social media phenomena, it is in fact little more than a disguised digital attack dog.

60.     It is for this very reason that Amber Heard's "team" turned to Bot Sentry as the lynchpin of a media campaign that would blame a secret network of misogynists utilizing "bots" and "platform manipulation"—and not the revelations about her conduct that emerged during the Depp / Heard trial or the jury verdict—as the reason for Heard's plummeting reputation.

**Bot Sentinel's Social Media Hit Job**

61.     On July 25, 2020, the *Times* of London published an article entitled, "Deppheads wage cyberwar on Amber Heard."

62.     "Deppheads" are obsessive fans of Johnny Depp.

63.     The source of the claim that "13 active inauthentic accounts" had been recently created "specifically to target the Twitter account of Ms Heard" was Bot Sentinel.

64.     On May 3, 2022, *Rolling Stone* magazine—the former counter-culture Bible best known in more recent times for its own failed defamation defense arising out of a 2014 article about a supposed gang rape at the University of Virginia—published an article entitled, "Are Johnny and Amber's Stans for Real? Cruel taunts, slanderous comments, and ugly death threats on social media have some wondering if the former couple's online supporters are human beings at all."

65.     "Stans" are obsessive fans.

66.     The "some" referred to in the *Rolling Stone* subtitle was Bot Sentinel.

67.     On July 18, 2022, entertainment website TheWrap.com published an article entitled, "Internet Trolls Inflated Amber Heard Hate on Twitter, Social Media Research Firm Finds: Bot Sentinel found 672 accounts solely aimed at spreading hate toward Amber Heard."

68.     That same day, *Variety* published an article entitled, "Amber Heard Supporters Target of 'Widespread Harassment' on Twitter, According to Firm Once Hired by Heard's Lawyers."

69.     That firm was Bot Sentinel.

70.     Also on July 18, 2022, the UK *Independent* published an article entitled, "Amber Heard subjected to 'one of the worst cases' of cyberbullying during Johnny Depp trial, study finds: Report looked at anti-Heard Twitter campaigns during the defamation trial with her ex-husband."

71.     The "report" referred to by the *Independent* was bought by Amber Heard from defendant Bot Sentinel.

**Bouzy Guns for LawTube**

72.     In September of 2022, Bouzy turned his censorious attention to LawTube, who, as set forth above, had been critical of the defense presented by Bot Sentinel's high-profile client, Amber Heard.

73.     Various LawTubers, including plaintiff, had also taken to sharing critical takes of the widely-reported Bot Sentinel claims of widespread "trollbot" activity engaged in coordinated social media attacks on Heard.

74.     Bouzy, offended by the criticism, started using his Twitter account to focus attention on LawTubers he deemed guilty of the same kind of "toxic troll-like behavior," "propaganda," and "fake news" he deemed inappropriate on Twitter, and demanding that YouTube delete their accounts.

75.     On September 17, 2022, Bouzy set his sights on plaintiff, tweeting, "Next up is 'Nate the Lawyer.' He went from being the son of two crackheads (his words), a drug dealer (his words), a cop, and a prosecutor, to attacking journalists and me on social media. You would think someone with a law enforcement background would know better."

76.     Bouzy later deleted this tweet, as well as the tweets reproduced below in which he doubled down on his attack on Mr. Broughty's veracity and professional qualifications, publishing yet more tweets—also deleted later—insisting that Mr. Broughty was lying about his credentials, would soon need a lawyer to defend himself against legal claims and engaged in deceptive advertising, *below*.





77.     As a self-described authority on Twitter trolling and manipulation, Bouzy was acutely cognizant of how the engagement he was generating on Twitter through his attacks on the popular Mr. Broughty could be converted into an advertisement for himself and Bot Sentinel.

78.     So, he published one:



79.     The next day, having learned that Mr. Broughty is, in fact, a New York attorney, Bouzy conceded on Twitter that his earlier claim to the contrary was false.  But Bouzy—who for years has falsely claimed to be a "software engineer"—repeated his assertion that even if plaintiff really was a lawyer, he still was lying about having been a prosecutor, *right*.

80.     Bouzy had no factual basis whatsoever for this false claim

81.     Eventually other Twitter users accused Bouzy of either "doxxing" plaintiff by revealing plaintiff's real name—which, like many social media users, Mr. Broughty had



chosen to keep private—or recklessly disregarding the truth of his repeated claims that plaintiff was lying about being a lawyer and a former prosecutor.

    82.    Bouzy responded that his earlier misrepresentations about Mr. Broughty were not, as some were suggesting, the result of mere negligence. Rather, Bouzy explained, he had knowingly and willfully published these false statements to his 120,000 Twitter followers for tactical purposes:



83.     Finally, realizing that he had been caught publishing a string of false and defamatory claims, Bouzy conceded the falsity of his claims about plaintiff's background and credentials.

84.     Bouzy wrapped these concessions, however, in a pathetic attempt to "troll" Mr. Broughty by accusing the latter of being a "Twitter troll" and "grifter," the latter epithet meaning that Mr. Broughty engages in "grift" or financial fraud, *below*:



85.     Even Bouzy, however, must have realized that these claims, while false and defamatory, were relatively anticlimactic compared to his earlier narrative of Nate the Lawyer being no lawyer at all.

86.      Bouzy, however, had another card up his sleeve.

**The Race Card**

87.      Bouzy's weeks of attacking LawTube, and particularly Mr. Broughty, had paid off well for the Bot Sentinel founder:  His Twitter account, and his audience for crowdfunding and self-promotion, had grown by thousands over the same period.

88.      To keep the pot boiling, on September 21st Bouzy played the trump card of social media engagement:  the race card.

89.      According to Bouzy, Mr. Broughty, an African American, was jealous of the success he, Bouzy, had achieved, and his criticism of Bouzy and his business were motivated by nothing more or less than a desire to "fit in with his Caucasian peers," as shown below:



90.     This was not Bouzy's first time portraying himself as a martyr to the forces of racial prejudice to manipulate his social media audience. In May of 2019, Bouzy began a series of tweets published over the course of several weeks and revisited over the course of the coming years ascribing his landlord's insistence that Bouzy pay rent to racial animus.

91.     A representative collection of these dozens of tweets, including one suggesting a comparison between his landlord's rent claims and a white slave-master cruelly whipping his cringing black slave, is reproduced as Exhibit A, along with a copy of the final order, dated August 20, 2021, ordering Bouzy to pay back rent to the landlord in the amount $10,560.78, plus $94.00 in costs.

**Bouzy's Claims of Criminal Conduct by Mr. Broughty**

92.     On September 20, 2022, Bouzy announced to his 100,000-plus Twitter audience that he had found the magic bullet that would fell Nate the Lawyer:  a supposed admission by Mr. Broughty of morally reprehensible, and felonious, conduct:  the planting of evidence on innocent criminal suspects, tweeting as shown below:



93.     This was truly a stunning claim for Bouzy to unearth against Mr. Broughty, a former police officer and criminal prosecutor—an admission so damning that Bouzy would not be deterred by the fact that Mr. Broughty had, in fact, never made it.

94.     If one false and defamatory tweet was, from Bouzy's point of view, good—very, very good—for the purpose of destroying his bête noire Nate the Lawyer, it stood to reason from his perspective that a series, or "thread," of them would be even better.

95.     Thus, on that same date Bouzy published just such a thread, taking on an attitude of what seemed to be, based on his claims of what the video said, the highest dudgeon and moral outrage, as shown *right*:





96.   For what he seemed to have intended as his *coup de grâce,* Bouzy composed a tweet that featured not only a race-treason angle but also included a meme in which a white man is shown in a movie scene laughing with an African American man—i.e.., with an effigy of his Internet rival, Nate the Lawyer—over what readers were to understand were misdeeds they had visited on African American suspects:



97.   Bouzy was so pleased with what he evidently believed was a perfect social media massacre of Mr. Broughty that he paid no heed to comments from other users questioning his take of what Mr. Broughty was "admitting" in the video and suggesting that Bouzy's claims did not stand up to a complete and reasonable viewing, as shown below:



98.    As comments questioning Bouzy's interpretation began to pile up in his replies, Bouzy

slipped into Bot Sentinel mode, describing Twitter users who had the temerity to disagree with his

take as "fake accounts":



99.     The next day, September 21, 2022, Bouzy continued down this path, reiterating his false and defamatory claim that Mr. Broughty "planted evidence" on innocent suspects in the tweet shown below:



100.     In this September 21, 2022 tweet, Bouzy once again took the opportunity to leverage the audience he attracted by falsely claiming Mr. Broughty "planted evidence on innocent suspects" to promote his own exaggerated accomplishments as a City College computer technician "at the same time."

101.     Bouzy could not resist this opportunity for self-promotion despite being aware, by virtue of his previous posts about Mr. Broughty's work history, that even if his false and defamatory claims about Mr. Broughty's conduct as a law enforcement officer had been true, they could not have occurred "at the same time" as Bouzy's supposedly pioneering work "building networks" at City College years earlier.

**The Cease and Desist Letter; Bouzy Blows Up**

102.     That same day, Mr. Broughty, through counsel, transmitted a letter to Bouzy by email and FedEx demanding that he cease and desist from defaming Mr. Broughty, retract his false claims

and delete any defamatory tweets still online (the "C&D Demand"), a true copy of which is attached hereto as Exhibit B.

103.    The C&D Demand also clearly advised Bouzy that Bouzy's false and defamatory characterization of Mr. Broughty's supposed "admissions" of planting evidence were false and defamatory, stating as follows:

> You are advised that to the extent you understood Mr. Broughty to be admitting to the felonies of planting and falsifying evidence to be actual admissions of unlawful conduct by him, that understanding is manifestly incorrect.  In fact, no civilian complaint or accusation was ever lodged against Mr. Broughty for any infraction – including mishandling evidence – in connection with any arrest in his 10-year law enforcement career, during which time he was also never "written up" (that is, given a departmental Infraction) for any misconduct whatsoever.

104.    Bouzy responded with a series of tweets, one of which consisted of direct and contemptuous responses to demands in the C&D Demand, two of which are reproduced below:





25

105.    Other Bouzy tweets made after he received the C&D Demand made a point of repeating his false and defamatory claim that Mr. Broughty made a video "admitting he falsified evidence when he was a cop," shown below.



106.    Another tweet by Bouzy broadly suggested—again, falsely—that although the C&D Demand advised Bouzy that no civilian complaint or accusation was ever lodged against Mr. Broughty for misconduct during his career in law enforcement, Bouzy had information to the contrary, as show below:



107.    Other false and defamatory statements tweeted by Bouzy after he received the C&D Demand included the following:

- "NateTheLawyer, LawTube, and Caroline Orr Bueno [a social science researcher who claims Bot Sentinel used technology based on her work] started [a] coordinated smear campaign [against Bot Sentinel] in September" (October 14, 2022);

- "Professional liars like NateTheLawyer prey on people who lack critical thinking skills" (October 17, 2022); and

- "Nathaniel Broughty bragged to his @YouTube viewers about illegally obtaining my social security number . . ." (October 26, 2022).

108.    Another series of new Bouzy tweets consisted of false claims or suggestions by Bouzy that Mr. Broughty was stealing, or making personal use of, donations collected by him for legal fees in this action by using illustrations of a black man pocketing a wad of cash; one describing donors as "gullible suckers" who donated to a "legal fund" set off by square quotes; and a third describing Mr. Broughty as an "opportunistic grifter," or fraudster, as shown below.



109.    Another Bouzy tweet along these lines, dated October 6, 2022, stated that after raising money for legal fees to pursue this action, "all he has accomplished is to take money from people and make himself [and his lawyer] richer."

110.    All the foregoing statements published by Bouzy on Twitter were and are false and defamatory, willfully intended to impugn Mr. Broughty's character, his legal and personal ethics and his skills and competence as an attorney and a legal commentator.

## FIRST CLAIM FOR RELIEF
### *Defamation Per Quod*

111.    Plaintiff Nathaniel Broughty incorporates the foregoing allegations as if fully set forth herein.

112.    These statements and others published by defendant concerning Mr. Broughty were and are false.

113.    The false statements published by defendant concerning Mr. Broughty were published, communicated, and transmitted to third parties.

114.    Defendant made and published the false statements alleged above knowing that they were false or with a reckless disregard for the truth.

115.    Mr. Broughty has been, and if the harm done to him is not remedied will continue to be, damaged by defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### *Defamation Per Se*

116.    Plaintiff Nathaniel Broughty incorporates the foregoing allegations as if fully set forth herein.

117.     The false claims made by defendant misrepresent Mr. Broughty's veracity, trustworthiness and qualifications to act as a lawyer.

118.     The false claims made by defendant misrepresent Mr. Broughty's veracity, trustworthiness and qualifications to act as a legal commentator.

119.     Defendant made and published the false statements alleged above knowing that they were false or with a reckless disregard for the truth.

120.     Mr. Broughty has been, and if the harm done to him is not remedied will continue to be, damaged by defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### *False Light Tort*

121.     Plaintiff Nathaniel Broughty incorporates the foregoing allegations as if fully set forth herein.

122.     To the extent any of the false statements published by defendant to the public by defendant are not literally false, they nonetheless place Mr. Broughty in a false light.

123.     The false claims by defendant identify Mr. Broughty specifically and clearly.

124.     The false claims by defendant misrepresent Mr. Broughty's character.

125.     The false claims by defendant misrepresent Mr. Broughty's legal ethics, credibility and competence.

126.     The defendant made and published the false statements alleged above knowing that they were false or with a reckless disregard for the truth.

127.     Mr. Broughty has been, and if the harm done to him is not remedied will continue to be, damaged by defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

*Intentional Interference with Prospective Business Advantage*

128.    Plaintiff Nathaniel Broughty incorporates the foregoing allegations as if fully set forth herein.

129.    On information and belief, Bouzy made the false statements stated above as part of a campaign to cause third parties, specifically social media platforms including, but not limited to, YouTube and Twitter, to limit, restrict or eliminate his access or ability to profit from publication of content on such platforms.

130.    The defendant made and published the false statements alleged above knowing that they were false or with a reckless disregard for the truth.

131.    Mr. Broughty has been, and if the harm done to him is not remedied will continue to be, damaged by defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

**WHEREFORE**, plaintiff Nathaniel J. Broughty requests judgment as follows:

i.    Awarding him compensatory damages to the extent allowed by law in an amount to be proved at trial;

ii.    Awarding him punitive damages to the extent permitted by law;

iii.    Ordering defendant to retract his false claims and statements about plaintiff publicly in a manner at least equal in reach to that by which he published his false statements;

iv.    To arrange for and purchase corrective advertising in such form and in such publications and media as shall be determined by the Court;

v.    Awarding such other relief and compensation as the Court shall deem just and equitable; and

    vi.  Awarding plaintiff his attorneys' fees and costs of suit.

DHILLON LAW GROUP, INC.
A CALIFORNIA PROFESSIONAL CORPORATION

By: _____
        RONALD D. COLEMAN

Josiah Contarino
50 Park Place, Suite 1105
Newark, NJ 07102
973-298-1723
rcoleman@dhillonlaw.com
*Attorneys for Plaintiff Nathaniel J. Broughty*

Dated:  October 28, 2022

## JURY DEMAND

    Plaintiff demands a trial by jury on all issues triable of right by a jury herein pursuant to R. 1-8 and R. 4:35-1(a).

## CERTIFICATION PURSUANT TO R. 4:5-1

    I certify that the matter in controversy is not the subject of any other court action or arbitration proceeding, and that no other parties should be joined in this action.

## DESIGNATION OF TRIAL COUNSEL

    Pursuant to R.4:25-4, the undersigned Ronald D. Coleman is hereby designated as trial counsel in this matter.

DHILLON LAW GROUP, INC.
A CALIFORNIA PROFESSIONAL CORPORATION

By: _____
        RONALD D. COLEMAN

Josiah Contarino
50 Park Place, Suite 1105
Newark, NJ 07102
973-298-1723
rcoleman@dhillonlaw.com
*Attorneys for Plaintiff Nathaniel J. Broughty*

Dated:  October 28, 2022

# EXHIBIT A



# EXHIBIT A



# EXHIBIT A



# EXHIBIT A



iv

# EXHIBIT A



# EXHIBIT A



# EXHIBIT A



# EXHIBIT A







RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

September 29, 2022

**BY EMAIL** ███████████ **AND FEDEX**

Mr. Christopher E. Bouzy
5101 Meadowview Avenue
North Bergen, NJ 07047-3160

<u>**Re: Defamation of "Nate the Lawyer" (Nathaniel J. Broughty)**</u>

Dear Mr. Bouzy:

    We represent Nathaniel James Broughty, Esq., who owns the YouTube channel "Nate the Lawyer." We write regarding certain false and defamatory statements made by you concerning Mr. Broughty on Twitter beginning on September 19, 2022 and demanding that you delete or, if already deleted, retract the statements made in these tweets. Your failure to do so will result in legal action.

    Beginning on that date and continuing until the present, you have falsely claimed on Twitter that Mr. Broughty has lied about his credentials, professional experience, media attention and other matters affecting his personal and professional reputations. You have also falsely stated that Mr. Broughty has engaged in criminal conduct and stated or implied that he is currently engaged in criminal or fraudulent conduct. In addition to demanding deletion or retraction of these public statements, we write to place you on clear notice of the truth concerning these matters, with the caveat that our immediate concern is the most serious and harmful of these defamatory statements, and the failure to include any others is in no way an admission of their truth.

        1.  <u>Claims that Mr. Broughty is not a lawyer.</u>

    Mr. Broughty is a licensed attorney of law in the State of New York and has been since 2016. Notwithstanding this readily ascertainable fact, on September 17, 2022, you published three tweets stating or clearly implying that Mr. Broughty is not a lawyer. You repeated this claim in a tweet dated September 18, 2022.

Mr. Christopher E. Bouzy
September 29, 2022
Page 2 of 4

You have evidently deleted these tweets, of which we have screen shots. But instead of claiming to have made an error, on September 18, 2022 you published another tweet in which you admitted that **you were aware of the truth when you made the false and defamatory claims** that Mr. Broughty was not really a lawyer **but willfully published these false claims anyway**.  A true copy of that September 18, 2022 tweet, still online at https://twitter.com/cbouzy/status/1571492580528951296?s=20&t=RX-dLSVkfL5CyYFKAFSh1w, is set out below.



*Figure 1*

These claims are false and defamatory. You must delete or retract them, or if appropriate do both, by October 3, 2022 or face legal action for your admitted willful defamation.

### 2.   Claims that Mr. Broughty engaged in misconduct as law enforcement officer.

You also made other false and defamatory statements on Twitter, specifically claiming:

1.   that Mr. Broughty was never a prosecutor (9/18/2022);
2.   that, as a University Police Officer for the City of New York, Mr. Broughty planted evidence on suspects (9/21/2022);
3.   that Mr. Broughty falsified evidence relating to criminal suspects (9/22/2022);
4.   that Mr. Broughty is stealing money donated for legal fees in connection with this matter (9/23/2022).

Again, each of these statements was false and harmful to our client, and hence defamatory. You must delete or retract them, or if appropriate do both, by October 3, 2022 or face legal action.

Your claim that Mr. Broughty planted evidence was presumably based on your understanding of tongue-in-cheek comments made by Mr. Broughty in a December 12, 2020

Mr. Christopher E. Bouzy
September 29, 2022
Page 3 of 4

Nate the Lawyer livestream found at https://www.youtube.com/watch?v=Wr43RCH pDr24&feature=share&si=ELPmzJkDCLju2KnD5oyZMQ&t=809. You are advised that to the extent you understood Mr. Broughty to be admitting to the felonies of planting and falsifying evidence to be actual admissions of unlawful conduct by him, that understanding is manifestly incorrect.  In fact, no civilian complaint or accusation was ever lodged against Mr. Broughty for any infraction – including mishandling evidence – in connection with any arrest in his 10-year law enforcement career, during which time he was also never "written up" (that is, given a departmental Infraction) for any misconduct whatsoever.

Being properly apprised of these facts, you are now legally obligated to retract your statements claiming the contrary by the date stated above to avoid further action.

3.  **Defamation by Bot Sentinel.**

To the extent you have used the Twitter account of your company Bot Sentinel or other social media or resources, including any "sock puppet" or fake accounts to make or amplify these or related false and defamatory statements about Mr. Broughty, these must be deleted, retracted or, where appropriate, both, by the October 3rd deadline as well.

This includes the email sent by Bot Sentinel on Friday, September 23rd, a copy of which we have obtained, claiming that Mr. Broughty has violated YouTube's policies, including by publishing harmful content targeting women and "marginalized communities."  These claims are factually false. Mr. Broughty has never violated YouTube's policies nor received any notification that his content does so; nor does he engage in such targeting.

This demand also includes Bot Sentinel's "report" of the same day claiming that Mr. Broughty's Twitter account was "disruptive", and that people engaging with his account are at some kind of risk, a false claim.  A screen shot of a tweet by you crowing about this presumably rigged "report" is shown at right as Figure 2.



All the foregoing false and defamatory statements made by you or Bot Sentinel, whether published through your or Bot Sentinel's known or official social media or email accounts or any other account, channel or mode of communication must be deleted or retracted, or both, no later than October 3, and evidence of the same provided to this office no later than October 5, 2022.

*Figure 2*

Mr. Christopher E. Bouzy
September 29, 2022
Page 4 of 4

  Failing the same, you and Bot Sentinel, and any person working in concert with you in publishing and promoting these false and defamatory statements about Mr. Broughty will be subject to legal action to vindicate Mr. Broughty's reputation and his legal rights.  Our client reserves all his rights in connection with the foregoing.

    Very truly yours,

    Ronald D. Coleman

# Civil Case Information Statement

## Case Details: HUDSON | Civil Part Docket# L-003607-22

**Case Caption:** BROUGHTY NATHANIEL  VS BOUZY CHRISTOPH

**Case Initiation Date:** 10/28/2022

**Attorney Name:** RONALD D COLEMAN

**Firm Name:** DHILLON LAW GROUP, INC.

**Address:** 50 PARK PL STE 1105

NEWARK NJ 07102

**Phone:** 9732981723

**Name of Party:** PLAINTIFF : Broughty, Nathaniel, J

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** DEFAMATION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Nathaniel J Broughty?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

10/28/2022

Dated

/s/ RONALD D COLEMAN

Signed

# Exhibit B



## New York State Unified Court System

Skip To:  Content | Navigation

### Attorney Online Services - Search

**Close**

### Attorney Detail Report *as of 11/02/2022*

| | |
|---|---|
| **Registration Number:** | 5472295 |
| **Name:** | NATHANIEL JAMES BROUGHTY |
| **Business Name:** | NATHANIEL BROUGHTY ESQ |
| **Business Address:** | 92 SAINT NICHOLAS AVE APT 2E<br>NEW YORK, NY 10026-2934<br>(New York County) |
| **Business Phone:** | (646) 408-6715 |
| **Email:** | nbroughty@gmail.com |
| **Date Admitted:** | 11/21/2016 |
| **Appellate Division Department of Admission:** | 1st |
| **Law School:** | City University of New York School of Law |
| **Registration Status:** | Attorney - Currently Registered |
| **Next Registration:** | Sep 2024 |

### Disciplinary History

*No record of public discipline*

 The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the OCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the Appellate Divisions of the Supreme Court in New York is available at www.nycourts.gov/courts.

 **Attorney Services**

Close

# Exhibit C

William P. Reiley (128872014)
BALLARD SPAHR LLP
700 East Gate Drive, Suite 330
Mount Laurel, NJ  08054-0015
reileyw@ballardspahr.com
Tel: (856) 761-3465

| | |
|---|---|
| NATHANIEL J. BROUGHTY, | **SUPERIOR COURT OF NEW JERSEY**<br>**LAW DIVISION: HUDSON COUNTY** |
| Plaintiff, | CIVIL ACTION |
| v. | DOCKET NO.:  HUD-L-003607-22 |
| CHRISTOPHER E. BOUZY, | |
| Defendant. | |

**NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

**TO:**  The Clerk of the Superior Court of New Jersey,
Hudson County, Law Division

**PLEASE TAKE NOTICE** that Defendant Christopher E. Bouzy, by and through his undersigned counsel, filed a Notice of Removal in the United States District Court for the District of New Jersey on November 4, 2022.

**PLEASE TAKE FURTHER NOTICE** that a true and correct copy of the original removal documents (excluding exhibits thereto), which were filed in the United States District Court for the District of New Jersey, are attached hereto as **Exhibit 1** and are being served along with this notice on Plaintiff's counsel.

**PLEASE TAKE FURTHER NOTICE**, pursuant to 28 U.S.C. § 1446(d), that no further proceedings shall occur in this Court unless and until this case is remanded.

Dated: November 4, 2022          */s/ William P. Reiley*
                                 William P. Reiley (128872014)
                                 BALLARD SPAHR LLP
                                 A Pennsylvania Limited Liability Partnership
                                 700 East Gate Drive, Suite 330
                                 Mount Laurel, NJ 08054-0015
                                 reileyw@ballardspahr.com
                                 Tel: (856) 761-3465

                                 *Counsel for Defendant*
                                 *Christopher E. Bouzy*