## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NATHANIEL J. BROUGHTY,

*Plaintiff,*

v.

CHRISTOPHER E. BOUZY,

*Defendant.*

Case No.:
2:22-cv-6458-SDW-AME

---

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

---

DHILLON LAW GROUP INC.
A California Professional Corporation
50 Park Place, Suite 1105
Newark, New Jersey 07102
917-423-7221
Ronald D. Coleman
Josiah Contarino
rcoleman@dhillonlaw.com
jcontarino@dhillonlaw.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .............................................................. iii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ...............................................................3

LEGAL ARGUMENT ...................................................................12

   I.  Standard of Review...........................................................12

   II.  New Jersey Law Governs Plaintiff's Claims, Not New York Law. .............13

      A.  This Court Should not Apply New York's Heightened Pleadings
         Standard for a Defamation Claim in Federal Court. ............................13

      B.  The Court Should Apply the Second Restatement to Determine the
         Choice of Law in this Matter....................................................14

      C.  The Factors of Section 6 of the Second Restatement Support the
         Application of New Jersey Law in this Matter. ...................................15

      D.  The Factors of Section 45 of the Second Restatement Support the
         Application of New Jersey Law in this Matter. ...................................17

      E.  Specific Tort Principles Support the Application of New Jersey Law
         in this Matter....................................................................18

      F.  New Jersey Case Law Supports the Application of New Jersey Law
         in this Matter....................................................................18

   III.  The Complaint States a Defamation Claim Under New Jersey Law. ...........21

      A.  Defamation Elements and Interpretation..........................................21

      B.  Opinions that imply false underlying facts can be defamatory............22

      C.  Bouzy's Tweets Evidence a Sufficient Degree of Fault. .....................25

         1.  Bouzy's tweets about Mr. Broughty's credentials and
            background were false and defamatory. .......................................26

2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was not a licensed attorney and was never a prosecutor. ....................................................................29

D. Bouzy Defamed Mr. Broughty When He Tweeted that Mr. Broughty Planted Evidence as a Police Officer. ...................................................32

1. Bouzy's tweets stating Mr. Broughty planted evidence as a police officer were false and defamatory. ....................................32

2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty planted evidence on innocent people. ..........................33

E. Bouzy Defamed Mr. Broughty When He Tweeted that Mr. Broughty was a Grifter. ........................................................36

1. Bouzy's tweets stating Mr. Broughty was a grifter were false and defamatory. ...........................................................36

2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was a "grifter." ...........................................38

IV. The Complaint States a False Light Claim Under New Jersey Law. ...........38

V. The Complaint States a Claim for Intentional Interference with Prospective Economic Relationship Under New Jersey Law. ......................40

CONCLUSION ......................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015)............... 14, 25

*Adams v. Gould Inc.,* 739 F.2d 858 (3d Cir.1984)....................................................40

*Almog v. Israel Travel Advisory Serv., Inc.*, 298 N.J. Super. 145 (App. Div. 1997)

.................................................................................................... 19, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................13

*Barasch v. Soho Weekly News, Inc.*, 208 N.J. Super. 163 (App. Div. 1986) ... 32, 33

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................12

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir. 1994) ...........................................................................24

*Biro v. Conde Nast*, 883 F. Supp. 2d 441 (S.D.N.Y. 2012)....................................23

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984)...........................................25

*Boulger v. Woods*, 917 F.3d 471 (6th Cir. 2019)....................................................24

*BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810 (S.D.N.Y. 2021)...... 31, 32

*Carbone v. Cable News Network, Inc*., 910 F.3d 1345 (11th Cir. 2018) ...............14

*Carwile v. Richmond Newspapers*, 82 S.E.2d 588 (Va. 1954)...............................24

*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163 (2d Cir. 2000) ...................26

*Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196 (1975)...................22

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) ........................ 24, 25

*Cibenko v. Worth Publishers*, 510 F. Supp. 761 (D.N.J. 1983)...............................14

*Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446 (3d Cir. 1987) ..........23

*Epifani v. Johnson*, 882 N.Y.S.2d 234 (2d Dep't 2009)..........................................37

*Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 450 N.J. Super. 1 (App. Div. 2017) ..................................................................................... passim

*Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dept 2015)...................22

*Ganske v. Mensch*, 480 F. Supp. 3d (S.D.N.Y. 2020) .............................................38

*Gillon v. Bernstein*, 218 F. Supp. 3d 285 (D.N.J. 2016)..........................................37

*Gnapinsky v. Goldyn,* 23 N.J. 243 (1957)................................................................26

*Govito v. W. Jersey Health Sys., Inc*., 332 N.J. Super. 293 (App. Div. 2000) . 13, 25

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) .....................35

*Henry v. Fox News Network LLC*, No. 21-CV-7299 (RA), 2022 WL 4356730 (S.D.N.Y. Sept. 20, 2022).............................................................. 39, 40

Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420 (App. Div.), *aff'd on rehearing*, 49 N.J. Super. 551 (App. Div. 1958))..................................................21

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) .........................13

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) ....................................................14

*Knutt v. Metro Int'l, S.A.*, 938 N.Y.S.2d 134 (2d Dep't 2012) ................................32

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) ......................................................14

*Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997).......................................................33

*Libre By Nexus v. BuzzFeed*, 311 F. Supp.3d 149 (D.D.C. 2018)...........................30

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659 (10th Cir. 2018) ......................................................................................................14

*Lutz v. Royal Ins. Co. of Am.*, 245 N.J. Super. 480 (App. Div. 1991)....................26

Lynch v. N.J. Educ. Assoc., 161 N.J. 152 (1999)......................................................23

*Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199 (D.N.J. 2011)21, 23, 28

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)........................................ 23, 24

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 17 CIV. 7568 (PGG), 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018).....................................................................35

Moe v. Seton Hall Univ., Civ. No. 09–1424, 2010 WL 1609680 (D.N.J. 2010)....24

*NY Mach. Inc. v. Korean Cleaners Monthly*, 17CV12269SDWLDW, 2018 WL 2455926 (D.N.J. May 31, 2018) ..........................................................................37

*P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132 (2008) ........................ 13, 15, 16, 18

*Paul v. Davis*, 424 U.S. 693 (1976) .........................................................................32

*Prager v. ABC*, 569 F. Supp. 1229 (D.N.J. 1983) ..................................................20

*Prince v. Intercept*, No. 21-CV-10075 (LAP), 2022 WL 5243417 (S.D.N.Y. Oct. 6, 2022) ............................................................................................................. 14, 35

*Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739 (1989) ................40

*Prof'l Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161 (3d Cir. 2007)....................................................................................40

*Romaine v. Kallinger*, 109 N.J. 282 (1988) ...................................................... passim

Singer v. Beach Trading Co., 379 N.J. Super. 63 (App. Div. 2005) ......................21

*Steinhilber v. Alphonse,* 501 N.E.2d 550 (N.Y. 1986) .............................................23

*Suozzi v. Parente*, 616 N.Y.S.2d 355 (App. Div. 1994) ...........................................35

*Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017)36

*Time, Inc. v. Pape*, 401 U.S. 279 (1971).................................................................35

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir.
      1990) .............................................................................................................39

*Ward v. Zelikovsky*, 136 N.J. 516 (1994)..................................................... 22, 26, 32

*Warriner v. Stanton*, 475 F.3d 497 (3d Cir. 2007)..................................................14

**Statutes**

Fed. R. Civ. P. 8 .....................................................................................................12

N.Y. Civ. Rights Law § 70-a ..................................................................................13

N.Y. CPLR 3221 .....................................................................................................13

**Other Authorities**

Restatement (Second) of Conflict of Laws § 146 (1971) ........................... 16, 17, 18

*Restatement (Second) of Torts* § 566 (1977) .........................................................22

Restatement (Second) of Torts § 580A....................................................................25

Restatement (Second) of Torts § 652E ........................................................... 38, 39

Restatement § 145(2). .............................................................................................17

**Treatises**

W. Keeton, *et al., Prosser and Keeton on the Law of Torts,* § 117 (5th ed. 1984) .39

## PRELIMINARY STATEMENT

While defendant Christopher Bouzy's livelihood depends on destroying the reputations of others, plaintiff Nathaniel Broughty is every bit the man he claims to be to his hundreds of thousands of YouTube fans: a lawyer, former prosecutor, criminal defense attorney, and former cop who came up from the streets and tells his viewers like it is. His livelihood, therefore, depends on his reputation.

Defendant Christopher Bouzy, on the other hand, has no reputation to protect and little to lose by defaming a man who does. Bouzy is a social media personality best known for a series of dubious online adventures—from crypto scams to phony software pitches—and, most recently, a program called Bot Sentinel that holds itself out as the definitive gatekeeper of appropriate Internet discourse. Bot Sentinel ranks Twitter users and provides subscribers with tools for blocking the "toxic" ones, based on what Bouzy describes as a leading-edge "machine-learning"–based algorithm that identifies Twitter "trolls," i.e., accounts that operate mainly to harass, ridicule and, frequently, defame other users.

There is ample proof that Bot Sentinel's social credit scores are the products, not of the rigorous algorithm Bouzy claims for them, but of views and people Bouzy does and does not like. And as a vocal skeptic of Bot Sentinel, and perhaps also a reminder of everything Bouzy is not in terms of character, hard work and personal achievement, Bouzy does not like Broughty, a former policeman, prosecutor and

criminal defense lawyer who makes the majority of his living as a YouTube streamer under the name "Nate the Lawyer."

Bouzy thus thrusts aside Bot Sentinel's flimsy curtain and, in a turn whose irony was lost on no one but himself, proceeded to give the Internet a free master class on nasty, personal and racially-infused Internet trolling aimed at Mr. Broughty. From accusations of race treason—despite the fact that both he and Mr. Broughty are African Americans with a liberal political bent—to cruel mockery of Mr. Broughty's humble origins as the child of a drug addict, and finally through a series of false and defamatory attacks on Mr. Broughty, Bouzy showed everyone exactly what social media toxicity is all about.

Admitting that his campaign against Mr. Broughty was intended to destroy his reputation, credibility and career, Bouzy started with what must have seemed the definitive coup de main. Bouzy announced on Twitter that his own intrepid research had uncovered the fact that the famous YouTuber "Nate the Lawyer," whose livelihood depends on his identity as a lawyer, was **no lawyer at all**. Twitter users quickly demonstrated, however, that only a bit of competent investigation established that Mr. Broughty is in fact a member of the New York bar.

Instead of admitting to negligence or incompetence, however, Bouzy publicly stated that, of course, he knew all along that Mr. Broughty was a lawyer, but said that he had purposely lied when he claimed otherwise. This, he explained, was a

deep stratagem of Internet polemic; those who know, he assured his followers, would understand it.

Emboldened by his ability to seemingly "get away" with saying whatever he thought would harm Mr. Broughty, Bouzy then published a series of even more "damning," but also false and defamatory tweets. Bouzy took to Twitter and made the scandalous and fantastic claim that Mr. Broughty had, during his career as a cop, planted and falsified evidence on criminal drug suspects. Bouzy knew that promulgating this lie would render Bouzy unreliable as a source of criminal law and social commentary on YouTube.

It was a lie, however, and Mr. Broughty immediately demanded its retraction. But Bouzy has never been held accountable in his decades of lying on the Internet, and was not about to start now. He did not merely refuse to retract these false claims; he dared Mr. Broughty to sue him for defamation. Mr. Broughty's hand was forced.

Faced with these facts, Bouzy's motion is long on misguided legal theorizing but short on confronting the defamatory nature of these well-pleaded allegations. Bouzy's motion to dismiss should be denied.

## STATEMENT OF FACTS

### 1. Nathaniel Broughty – Street kid turned cop, lawyer and YouTube success

Plaintiff Nathaniel Broughty is a former University Police Officer of the City New York, a member of the New York Bar, a former Bronx County Assistant

District Attorney, and a former law school instructor who created and operates a YouTube channel under the name of "Nate the Lawyer." Compl. ¶ 1. The purpose of this YouTube channel is to make the law more accessible to people. *Id.* ¶ 2. Since its founding in 2014, channel has collected over 27.6 million views. At the time of the filing of the Complaint, the channel had approximately 255,000 subscribers. *Id.*

The Nate the Lawyer Channel is best known for its "livestreams" and "videos on demand" which are transmissions of video and audio over the internet by channel hosts who attract viewers to their programs by virtue of expertise, personality, guest selection or other qualities. *Id.* ¶ 6.  Through his work on the Nate the Lawyer Channel, plaintiff is part of an informal group of experienced lawyers with law-oriented YouTube channels who "livestream"—often as a group appearing on one channel—legal commentary and discussion often referred to as "LawTube." *Id.* ¶ 12. As described in a May 26, 2022 article in the Los Angeles *Times*, livestreams of sensational trials accessible to in-court cameras, such as the recent criminal trial of Kyle Rittenhouse, have become a new and arguably dominant way for Internet users to watch these trials. *Id.* ¶ 14. Livestreams by LawTubers and other livestreamers depend for their popularity in large part on how potential viewers perceive their host's experience, professional knowledge and, above all, credibility. *Id.* ¶ 16.

### 2.  Christopher Bouzy – A career of Internet scamming

Defendant Christopher E. Bouzy is a serial failed entrepreneur and, in the

opinion of many, a serial successful swindler. *Id.* ¶ 3. He is the CEO of Bot Sentinel, Inc., a domestic for-profit corporation of the State of New Jersey. *Id.* Before Bot Sentinel, Bouzy tried and failed to start or operate several businesses, all of which have been lambasted online as scams or confidence games. *Id.* ¶¶ 30-38.

Bot Sentinel, which at the time of this writing had only one employee, i.e. the defendant, claims that it uses "machine learning" to detect Twitter "trollbots" or "bots," which it defines as "human controlled accounts who [sic] exhibit toxic troll-like behavior." *Id.* ¶ 48. Twitter, however, is not convinced that Bot Sentinel uses any such "machine learning." *Id.* ¶ 53. In response to Bot Sentinel's claims, Twitter officials have written that Bot Sentinel appears simply to direct a human to look at an account using the same public information available to any average user, and then identifies characteristics—such as the account name, level of tweeting, location in the bio, hashtags used—to **guess** whether the account is a bot. *Id.* Twitter believes that Bot Sentinel's "[b]inary judgments of who's a 'bot or not' . . . have [a] real potential to poison our public discourse." *Id.*

Movie star Johnny Depp's ex-wife, movie star Amber Heard, hired Bot Sentinel to combat negative online comments during the defamation trial between Heard and Depp, which resulted in a substantial plaintiff's defamation verdict in Depp's favor. *Id.* ¶¶ 42-43, 60. Once Bouzy learned of the LawTubers' criticism not only of Heard's legal team but also of the widely-reported claims in media

sympathetic to Heard that Bot Sentinel had detected widespread "trollbot" activity coordinating to attack Heard on social media, Bouzy put Mr. Broughty in his sights, tweeting, "Next Up is 'Nate the Lawyer.' He went from being the son of two crackheads (his words), a drug dealer (his words), a cop, and a prosecutor, to attacking journalists and me on social media. You would think someone with a law enforcement background would know better." *Id.* ¶¶ 72-75. Bouzy did not explain why someone with a law enforcement background would "know better" than to criticize him or journalists, activities that are protected by the First Amendment.

### 3.  Bouzy Defames Mr. Broughty

Bouzy began his defamatory campaign against Mr. Broughty on September 17, 2022 with an attack on Mr. Broughty's credentials, falsely claiming that "Nate the Lawyer" was lying about being a licensed attorney. He complained that YouTube did not verify that those who claimed to have professional licenses actually did. *Id.* ¶ 76. Bouzy claimed to have proved that Mr. Broughty was not a lawyer based on his failure to find Mr. Broughty on the online New York attorney database. *Id.*  As it turned out, however, Bouzy was not searching for Mr. Broughty's correct name, which Bouzy subsequently, if inexplicably, admitted that he "expected" was the case. *Id.* ¶ 79. Undeterred by having his fantastic, but utterly erroneous, public claim about Mr. Broughty disproved, Bouzy doubled down on his strategy of just making things up about Mr. Broughty and tweeting them.  Yes, Bouzy admitted, he had been

wrong when he said that Mr. Broughty was not a lawyer.  But, he said, Mr. Broughty was lying about having been a prosecutor.  *Id*.; see *Figure 1*.



*Figure 1*

Of course, that was a lie, too, as Bouzy was forced to admit quickly, as shown in the tweet reproduced as *Figure 2* below, in which Bouzy—who by all indications never attained a degree—was reduced to merely sneering at Mr. Broughty's career and academic attainments as "[q]uite the resume":



*Figure 2*

*Id*. ¶ 84. Shockingly, Bouzy then stated that, in fact, his lie on Twitter had been quite intentional: He already **knew** Mr. Broughty's correct name, but still **claimed** that he could not find Mr. Broughty in New York's attorney database so that **someone else** would identify "Nate the Lawyer's" real name. In other words, claimed Bouzy (*Figure 3*, below), he avoided "doxxing[1]" Broughty—by defaming him:



*Figure 3*

---

[1] "Doxxing" is sharing someone's private information online without their permission and violation of Twitter Terms of Service. See https://help.twitter.com/en/rules-and-policies/personal-information

*Id.* ¶ 82.[2]

Caught lying about Mr. Broughty's credentials and work history, Bouzy moved on to accusing Mr. Broughty of being a racist. *Id.* ¶ 89. On September 20, 2022, Bouzy traversed from race to criminality, stating that, as a police officer, Mr. Broughty had planted evidence on innocent criminal suspects. *Id.* ¶ 92. Bouzy continued by claiming, with no basis, that many innocent people's lives were ruined because of Mr. Broughty's "felony." *Id.* at 95. Bouzy insisted that Mr. Broughty's law license should be suspended. *Id.*

The problem with Bouzy's brazen statement of Mr. Broughty's felonious conduct was that Mr. Broughty **never** admitted that he planted evidence on unsuspecting suspects. *Id.* ¶ 93. Bouzy conceded this point when he later attempted to justify his outrageous statement, arguing that Mr. Broughty **must** have planted evidence because he said, as a former police officer, he knew all the tricks from when he was a police officer. *Id.* ¶ 92.

That same day, September 20, 2022—within hours of Bouzy's **first** defamatory statement that Mr. Broughty "planted evidence"—Mr. Broughty took to Twitter to further explain the comments that Bouzy had distorted to claim an

---

[2] In his motion papers, Bouzy claims to have provided all relevant tweets for the Court's full consideration of the motion. This one, however—in which he **admits** to purposely lying about Mr. Broughty's professional qualifications and veracity— was buried in a footnote.

admission of serious illegal conduct by Mr. Broughty, stating unequivocally that he never planted evidence, and diving deeper into his experience as a cop. Bouzy tweeted, as shown in Figure 4, a response to Mr. Broughty's denial of Bouzy's defamatory claim that, in fact, no: it really was an admission, despite Mr. Broughty's denial and despite the lack of any corroborating evidence or third party claim that he had:



*Figure 4*

Bouzy then made a more specific false allegation. Instead of claiming Mr. Broughty said he planted evidence as an officer in a video, Bouzy next claimed that Mr. Broughty planted evidence before he was in law enforcement.  On September 21, 2022, Bouzy wrote, "Why is Nathaniel lying to his followers? When I was in my early 20s, I was building networks and servers for high schools and universities, while he is was planting evidence on innocent suspects...."



*Figure 5*

*Id*. ¶99. Bouzy knew this claim was false but posted it anyway. Bouzy knew Mr.

Broughty did not work in law enforcement at that time (early 2000s) because Bouzy

had posted Mr. Broughty's work history and claimed he had all Mr. Broughty's

background information. *Id*. ¶ 84. Bouzy knew that Mr. Broughty was not employed

as a law enforcement officer at that time, and thus it was impossible for Mr. Broughty

to plant evidence on suspects as a member of law enforcement because he was not

yet in law enforcement at that time. His false statement amassed 651 "Likes," which

shows at least 651 people, and in all probability far more, saw it.

Thereafter, on September 29, 2022, Mr. Broughty's counsel served Bouzy

with a demand letter to delete the defamatory tweets and retract the statements

therein. The letter reiterated that Mr. Broughty never planted evidence. It also

demanded retractions of Bouzy's defamatory statements that Mr. Broughty was

never a prosecutor; that Mr. Broughty falsified evidence relating to criminal

11

suspects; and that Mr. Broughty was stealing money donated for legal fees in connection with this matter. *Id.* ¶¶ 102-103.

After receiving the demand letter, Mr. Broughty ran to Twitter to announce that he would not comply with Mr. Bouzy's demands that he retract his false statements:



*Figure 6*

Indeed, on October 5, 2022, Bouzy again published tweets claiming that Mr. Broughty planted evidence when he was a police officer. *Id.* ¶¶ 105-106.

## LEGAL ARGUMENT

### I.   Standard of Review.

A motion to dismiss brought under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint does not require detailed factual allegations; it simply must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To determine whether a complaint states a claim, courts

"draw on [their] judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court need only "infer more than the mere possibility of misconduct" to find a claim. *Id.* at 679. The court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

## II. New Jersey Law Governs Plaintiff's Claims, Not New York Law.

### A. This Court Should not Apply New York's Heightened Pleadings Standard for a Defamation Claim in Federal Court.

The first step in a conflict of law analysis is to determine if there is indeed a conflict of law between states, in this case New York and New Jersey. *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). The obvious conflict in this matter is that, according to Bouzy, New York law requires a defamation plaintiff to plead "actual malice" at the pleading stage even as a non-public figure (Def. Br. at 19). New Jersey requires only a showing of negligence for a non-public figure. *Govito v. W. Jersey Health Sys., Inc.*, 332 N.J. Super. 293, 306 (App. Div. 2000) ("Fault in private defamation is proven by a negligence standard"). And even for a public figure, New Jersey does not require, as New York's anti-SLAPP statute does, that a defamation complaint have a "substantial basis" for its claims, on pain of serious sanctions. N.Y. Civ. Rights Law § 70-a, citing N.Y. CPLR 3221(g).

It is far from clear, however, that a federal court sitting in New Jersey would or should apply the heightened pleading standard of New York's anti-SLAPP statute

to a motion under Fed. R. Civ. P. 12(b)(6), regardless of the cause of action. Even the Second Circuit has declined to do so. *See La Liberte v. Reid*, 966 F.3d 79, 86–88 (2d Cir. 2020); *Prince v. Intercept*, No. 21-CV-10075 (LAP), 2022 WL 5243417, at *18 (S.D.N.Y. Oct. 6, 2022) ("Courts in this district have held that § 70-a is inapplicable in federal court because its "substantial basis" standard articulated in New York's anti-SLAPP law [ ] conflicts with the standards under Federal Rules of Civil Procedure 12 and 56"; cleaned up; citing cases).[3]

### B. The Court Should Apply the Second Restatement to Determine the Choice of Law in this Matter.

On page 10 of his brief Bouzy correctly states that New Jersey's choice of law rules apply here because New Jersey is the forum state, *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007), and that "the law of plaintiff's domicile will apply in libel and privacy actions if publication occurred there," *Cibenko v. Worth Publishers*, 510 F. Supp. 761, 766 (D.N.J. 1983) (citation omitted). And the parties agree that Mr. Broughty's domicile is New York. But what Bouzy fails to show in arguing that New York law should apply here—indeed, he fails even to make the argument—is that the "publication" of his defamatory tweets "occurred" in New York, as opposed to New Jersey, where he resided (and still resides) when tweeting.

---

[3] *Accord Klocke v. Watson*, 936 F.3d 240, 244–49 (5th Cir. 2019); *Carbone v. Cable News Network, Inc*., 910 F.3d 1345, 1349–57 (11th Cir. 2018); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc*., 885 F.3d 659, 668–73 (10th Cir. 2018); *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333–37 (D.C. Cir. 2015).

Even under the anemic standard put forth by Bouzy, then, Bouzy's argument that New York law applies fails because he published the tweets in New Jersey. A fuller analysis using New Jersey's choice of law standards also reveals that New York law is not appropriate for deciding this matter. New Jersey "expressly embrace[s] the Second Restatement for choice-of-law determinations" involving torts. *Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 450 N.J. Super. 1, 34 (App. Div. 2017) (citing *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 139–43 (2008)). "The Second Restatement's approach focuses on the state with 'the most significant relationship' to the parties and issues." *Id.* at 42 (quoting *P.V.*, 197 N.J. at 136). To determine the most significant relationship, New Jersey examines sections 6 and 145 of the Second Restatement and specific tort principles, in that order. *Id.* at 47.

### C. The Factors of Section 6 of the Second Restatement Support the Application of New Jersey Law in this Matter.

The factors of Section 6 of the Second Restatement support this Court's use of New Jersey law to resolve this matter. Section 6 includes seven factors: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination

and application of the law to be applied. Restatement (Second) of Conflict of Laws § 146 (1971) [hereafter "Restatement"]. "The factor that deserves the greatest emphasis in a particular case is that which furthers the most relevant policy interest, such as 'protecting the justified expectations of the parties' or 'favoring uniformity of result.'" *Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 450 N.J. Super. 1, 48 (App. Div. 2017) (quoting Restatement § 6 cmt. e).

The New Jersey Supreme Court has noted that "interstate comity additionally counsels that the forum state should defer to the other state's local law if: (1) applying the forum state's local law would 'substantially impair' the other state's ability 'to regulate the conduct of those who chose to operate within its borders,' and (2) applying the other state's local law would not inhibit the forum's ability to regulate conduct that occurs within its own borders." *Id.* at 48-49 (quoting *P.V.*, 197 N.J. at 152-53). Neither of these considerations are relevant here because (i) applying New Jersey defamation law against a New Jersey resident does not result in impairment, let alone a substantial impairment, on New York law, and (ii) applying New York law would inhibit New Jersey's ability to regulate conduct that occurs within its borders.

For these reasons, factors (a), (b), (c) and (e) weigh in favor of applying New Jersey law. So does factor (d), because a New Jersey resident has no reasonable expectation of receiving protection from another state's policy when committing

online defamation. Whether New Jersey or New York law is used does not appear to much affect factors (f) or (g), thus those favor neither state. On balance, then, the factors of Section 6 overwhelmingly support New Jersey law.

### D. The Factors of Section 45 of the Second Restatement Support the Application of New Jersey Law in this Matter.

The factors set out by Section 45 of the Second Restatement support the application of New Jersey law also. "In addition, when a cause of action sounds in tort, the general choice-of-law rule is to ascertain the state with 'the most significant relationship to the occurrence and the parties under the principles stated in [section] 6.'" *Fairfax*, 450 N.J. Super. at 50 (quoting Restatement § 145(1)). Certain "contacts" are taken into account, such as (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. Restatement § 145(2).

These Section 45 factors also favor the application of New Jersey law. Factor (b): Bouzy tweeted in New Jersey as a New Jersey resident, thus New Jersey is place where the conduct **causing** the injury occurred. Factor (c) is a wash because Bouzy is a New Jersey resident and Mr. Broughty is a New York resident. Factor (d) does not have much relevance because any relationship between the parties occurred online. And while, at first blush, factor (a) would appear to favor the application of

17

New York law, because Bouzy's defamatory tweets damage Mr. Broughty's credibility as a legal analyst on YouTube, Mr. Broughty's injury cannot be said to have occurred in New York but is, in fact, suffered nationwide. On balance, then, the Section 45 factors favor the application of New Jersey law here.

### E. Specific Tort Principles Support the Application of New Jersey Law in this Matter.

"In addition to section 145's general factors for torts, the Second Restatement also provides more specific choice-of-law rules for particular torts." *Fairfax*, 450 N.J. Super. at 52 (App. Div. 2017) (citing *P.V.*, 197 N.J. at 141). These include "injuries resulting from defamation or injurious falsehood." *Id.* (citation omitted). Section 150 governs multistate defamation, and provides that the rights and liabilities from a defamatory matter in an aggregate communication (like posts on the internet) are determined by the state with the most significant relationship "to the occurrence and the parties under the principles stated in § 6." Restatement § 150(1). We already determined that Section 6 favors the application of New Jersey law to this matter. Inasmuch as Section 150(1) tracks Section 6, it similarly favors the application of New Jersey law.

### F. New Jersey Case Law Supports the Application of New Jersey Law in this Matter.

In addition to the many factors of the Restatement that show New Jersey substantive law applies in this matter, New Jersey case law also requires the

application of New Jersey law. The late Judge Pressler's comments to the New Jersey Rules of Court identify *Almog v. Israel Travel Advisory Serv., Inc.*, 298 N.J. Super. 145, 158 (App. Div. 1997), as the leading authority for New Jersey choice of law analysis involving a defamation claim. Pressler & Verniero, *supra*, R. 4:5-4 cmt. 6.3.1, Defamation.

In *Almog*, the Appellate Division ruled that "New Jersey law applied to defamation by [a] New Jersey resident against Israel residents committed in New Jersey, elsewhere in the United States and in Israel." *Id.* Specifically, the defendants were in the business of organizing tours in Israel for American travelers and employed the plaintiffs, independent contractors who provided the guided Israel tours. *Almog*, 298 N.J. Super. at 150. In both the Israel and the United States the defendants falsely accused one of the plaintiffs of gross theft and marital infidelity. *Id.* at 152. That plaintiff was unable to secure another job in either the tourist industry or any industry because of the defendants' defamatory statements. *Id.* at 151-52.

To decide whether Israel or New Jersey law should apply, the court first determined a conflict existed because Israel law did not provide for punitive damages and New Jersey law did. *Id.* at 158. The court reasoned that New Jersey has "a significant interest in deterring wrongful conduct by its residents. The goal of our tort law is not only to afford the victim a remedy for a wrong but to deter the resident tortfeasor and others who would commit such wrongs from engaging in that

wrongful conduct." *Id.*

Although the court determined that the defendants' defamatory conduct was committed not just in New Jersey but also elsewhere in the United States and in Israel, the court was moved by the expanded defenses defendants would have under Israel law and that New Jersey has a significant interest to apply its law to not only afford the victims a wrong but also punish (and thereby deter) defamatory practices in New Jersey. *Id.* at 158; *see also id.* ("A fuller remedy is available to the victims under New Jersey law than in Israel in respect of the scope of damages.").[4]

By every relevant standard, New Jersey law controls this matter, and Bouzy's motion should be decided under New Jersey law.

---

[4] Bouzy relies on *Fairfax*, 450 N.J. Super. at 56, because that court applied New York law to "defamation-like" claims. (Def. Br. at 10.) That reliance is misplaced and unpersuasive. First, although the court in *Fairfax* applied New York law because it was in New York where the plaintiff's reputation was most damaged—a fact for which there is absolutely no basis in the pleadings or otherwise here—the court came to that conclusion only after considering all the factors of Section 6 of the Restatement, Section 145 of the Restatement, and other specific tort principles. *Id.* at 47-57. In that regard, and by way of example, Bouzy omits that the majority of the defendants' actionable conduct in *Fairfax* occurred in New York, *id.* at 49, quite different from what occurred here, where his conduct took place in New Jersey and the effect on Mr. Broughty's reputation is national.

Bouzy's reliance on *Prager v. ABC*, 569 F. Supp. 1229 (D.N.J. 1983), is similarly misplaced. In *Prager*, unlike here, the defamatory content was broadcasted **from** New York, and the plaintiff's domicile was New York. Here, Bouzy's tweets originated here in New Jersey while Bouzy was a New Jersey resident.

### III. The Complaint States a Defamation Claim Under New Jersey Law.

### A. Defamation Elements and Interpretation.

"To establish defamation under New Jersey law, a plaintiff must show the defendant (1) made a false and defamatory statement concerning the plaintiff, (2) communicated the statement to a third party,[5] and (3) had a sufficient degree of fault." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011) (footnote omitted) (citing *Singer v. Beach Trading Co.,* 379 N.J. Super. 63, 79 (App. Div. 2005)). "The threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning." *Id.* (citations omitted). The "court must evaluate the language in question 'according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.'" *Id.* (quoting *Herrmann v. Newark Morning Ledger Co.,* 48 N.J. Super. 420, 431 (App. Div.), *aff'd on rehearing*, 49 N.J. Super. 551 (App. Div. 1958)).

"If a published statement is susceptible of one meaning only, and that meaning is defamatory, the statement is libelous as a matter of law." *Romaine v. Kallinger*, 109 N.J. 282, 290 (1988) (citations omitted). "Conversely, if the statement is susceptible of only a non-defamatory meaning, it cannot be considered libelous, justifying dismissal of the action." *Id.* "However, in cases where the statement is

---

[5] There is no dispute that Bouzy's tweets were communicated to third parties, so this element need not be analyzed.

capable of being assigned more than one meaning, one of which is defamatory and another not, the question of whether its content is defamatory is one that must be resolved by the trier of fact." *Id.* at 290-91.

A "defamatory statement is one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ward v. Zelikovsky*, 136 N.J. 516, 529 (1994) (citation and internal quotation marks omitted).[6]

**B. Opinions that imply false underlying facts can be defamatory.**

New Jersey follows the *Restatement (Second) of Torts* § 566 (1977) to determine whether an opinion is actionable as defamation. *Dunn v. Gannett New*

---

[6] Putting aside the distortions caused by New York's anti-SLAPP law, New York's underlying defamation law is substantially similar to New Jersey's. Under New York law, a plaintiff bringing a defamation claim must establish: (1) a false statement of fact, (2) of and concerning the plaintiff, (3) published to a third party, (4) that either causes special harm to the plaintiff or is defamatory *per se*, and (5) that was published with constitutional malice, gross irresponsibility, or negligence. *See Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 198-99 (1975). Defamation is "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [plaintiff] in the minds of right-thinking persons, and to deprive [plaintiff] of their friendly intercourse in society." *3P-733, LLC v. Davis*, 135 N.Y.S.3d 27, 29-30 (1st Dep't 2020) (alterations in original) (citation omitted).

To satisfy the falsity element of a defamation claim, Respondent must allege that the complained-of statement is "substantially false." *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dept 2015) (citation omitted). Words are defamatory when they "arouse in the mind of the average person in the community an evil or unsavory opinion []or expose Respondent to public hatred, contempt, or aversion." *Pritchard v. Herald Co.*, 120 A.D.2d 956, 956 (4th Dep't 1986) (citations omitted).

*York Newspapers, Inc.*, 833 F.2d 446, 452-53 (3d Cir. 1987). "[A] 'mixed opinion' is one that is "apparently based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication.'" *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 205 (D.N.J. 2011) (citing *Lynch v. N.J. Educ. Assoc.,* 161 N.J. 152, 167 (1999)). "[O]pinion statements can trigger liability if the statements "imply false underlying objective facts." *Id.* It is not whether the statement may be described as an opinion but instead whether it reasonably would be understood to imply a provable fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (reporter's opinion that plaintiff committed perjury constituted defamation).[7]

In *Mangan*, the court denied a motion to dismiss the plaintiff's (ex-CEO) defamation claims against the defendant (subsequent CEO) over the defendant's accusing the plaintiff of "financial improprieties," which "impl[ied] that [p]laintiff was fired for 'cooking the books." *Id.* at 202. The defendants argued that the foregoing statements were "statements of opinion,"  but the court found the statements were "mixed opinion and fact," and sufficient to state a claim because the

---

[7] *See Biro v. Conde Nast*, 883 F. Supp. 2d 441, 468 (S.D.N.Y. 2012) (holding that an unstated inference may be defamatory when the plaintiff challenges the veracity of the underlying facts); *see also Steinhilber v. Alphonse,* 501 N.E.2d 550, 552–53 (N.Y. 1986) ("When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a mixed opinion' and is actionable.")

facts underlying the opinion were verifiable—they were "able to be proven true or false." *Id.* at 205 (citation omitted).

Similarly, this Court in *Moe v. Seton Hall Univ.,* Civ. No. 09–1424, 2010 WL 1609680, at *8 (D.N.J. 2010), found that alleged opinion statements made by the defendant that implied specific attributes about the plaintiff were sufficient to constitute defamation. The plaintiff alleged that it was defamatory for Seton Hall to include on her transcript that she was "expelled for academic cause and had exhibited unprofessional conduct." *Id.* Although Seton Hall argued this notation on the plaintiff's transcript was non-actionable opinion only, the court found the notation insinuated that the plaintiff's academic performance was below the minimum standard and her conduct was unprofessional, which she alleged was false. *Id.*

Defamatory insinuations dressed up as questions will also not escape liability.[8]

---

[8] *Boulger v. Woods*, 917 F.3d 471, 480 (6th Cir. 2019) ("mere insinuation is as actionable as a positive assertion, if the meaning is plain, and it has been held repeatedly that the putting of the words in the form of a question will in no w[ay] reduce the liability of the defendant." (citation and internal quotation marks omitted) (alterations in original)); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993) (a "question can conceivably be defamatory, though it must be reasonably read as an *assertion* of a false *fact*"); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195-96 (8th Cir. 1994) ("statements in the form of opinions or questions do not enjoy absolute protection[;] as such to be actionable such statements must be reasonably read as an *assertion* of a false *fact*" (internal quotation marks and citations omitted)); *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 589–90 (Va. 1954) (publicly asking a public official

### C. Bouzy's Tweets Evidence a Sufficient Degree of Fault.

Where public figures are aggrieved by defamatory publications, the standard of fault requires the defendant's knowledge that the statement is false or a reckless disregard of its truth or falsity. *Govito*, 332 N.J. Super. at 306 (citation omitted). Reckless disregard is whether there is a high degree of awareness of probable falseness or serious doubts as to its truth. Restatement § 580A cmt. d. Availability of time and opportunity to investigate the truth can inform the reckless disregard standard. *Id.* "Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." *Id.*[9]

---

whether he would be seeking disciplinary action against an attorney, followed by a recitation of the disbarment process within the state, was a defamatory statement).

Defendant's motion selectively quotes multiple cases and omits relevant context to falsely represent that "as a matter of law, questions are not actionable statements of fact." (Def. Br. at 23). In so doing, defendant not only brazenly misstates the law, but intentionally omits key portions of the very same decisions he relies on which expose the falseness of his legal assertions. *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1338, fn. 7 (D.C. Cir. 2015) ("To be sure, . . . as case law bears out, questions that contain embedded factual assertions may sometimes form the basis for a successful defamation claim."); *see also Chapin*, 993 F.2d at 1094 (omitted portion of sentence quoted, *supra*, at p. 25).

[9] Contrary to Defendant's assertions, the court in *Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984), did not hold that "actual malice . . . requires knowledge of falsity '**at the time of publication**.'" Rather, the court held that the plaintiff could not establish actual malice because it had failed to prove by clear and convincing evidence that the plaintiff's agent realized that he had used *misleading speech* to describe a product "at the time of publication." *Id.* at 512-13 (concluding that "the difference between hearing violin sounds move around the room and

### 1. Bouzy's tweets about Mr. Broughty's credentials and background were false and defamatory.

Bouzy's tweets about Mr. Broughty's credentials and background were false. "A statement made in the context of and pertaining to a person's trade, profession or business, such as in this case, is actionable if the statement is made with reference to a matter of significance and importance relating to the manner in which the subject of the statement carries out his trade, profession or business." *Lutz v. Royal Ins. Co. of Am.*, 245 N.J. Super. 480, 492–93 (App. Div. 1991) (citation and internal quotation marks omitted). Statements that falsely portray "occupational incompetence or misconduct" are defamatory *per se*. *Ward,* 136 N.J. at 526 (citing *Gnapinsky v. Goldyn,* 23 N.J. 243, 250-51 (1957)).[10]

In addition to his law practice, Mr. Broughty runs a successful YouTube channel where he comments on various current events, with a focus on high profile

---

hearing them wander back and forth fits easily within the breathing space that gives life to the First Amendment.").

   [10] Although defendant does not notify the court or opposing counsel through accurate citation, defendant mistakenly relies on a *dissent* as authority for his conclusion that Bouzy's "mistake" in searching for the wrong name in the database "does not establish actual malice." (Def. Br. at 24-25 (citing *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 193 (2d Cir. 2000) (Jacobs, J., dissenting)). In *Celle*, the Second Circuit actually held that "[a]ctual malice can be established '[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence'; and that "[e]vidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." *Celle*, 209 F.3d at 183 (internal citations omitted).

legal disputes. Mr. Broughty's legal commentary is informed by his past role as a prosecutor, and his current role as an attorney in private practice. Mr. Broughty's viewers know this. And both as a legal analyst and attorney, Mr. Broughty's character is crucial.

Bouzy's character-assassination hit on all these fronts. Bouzy stated Mr. Broughty was neither a prosecutor nor an attorney. The only implication from Bouzy's statements is that Mr. Broughty was lying about his professional experience: lying about being a prosecutor and attorney when he was not one. Bouzy's statements were not just "made with reference to a matter of significance and importance" to how Mr. Broughty "carries out his trade, profession or business," but indeed stated that Mr. Broughty was no attorney at all, and certainly not an attorney who was a former prosecutor.

Bouzy attempts to justify his tweets by arguing they were "substantially true." They were not. In one tweet, Bouzy wrote that Mr. Broughty "was never a prosecutor." This statement of fact is unequivocally false. In another tweet, Bouzy wrote: "I am sure there is a reasonable explanation for why we can't find him in the database where he claims he practices law. **He might want to retain a real lawyer.**" Compl. ¶ 76 (emphasis added). Bouzy included with this tweet screenshots of a YouTube episode featuring Mr. Broughty and a screenshot of the New York attorney database.

27

If Bouzy wrote **only** that he could not find Mr. Broughty in the attorney database, and if indeed that was reasonable (see next section for why it was not), then an argument of substantial truth might hold some water. But Bouzy also wrote that Mr. Broughty "might want to retain a real lawyer," implying both that Mr. Broughty—whose work both as a lawyer and an Internet commentator depend on his reputation for veracity—was lying when he claimed to be a licensed attorney and that he could be in legal trouble because of it. Opinion based on unstated false "facts about the plaintiff or his conduct" is defamatory. *Mangan*, 834 F. Supp. 2d at 205. The unstated false fact here is that obvious inference that Mr. Broughty is lying about being a licensed attorney. There would be no other reason why he "might want to retain a real lawyer."

Even the phrase "real lawyer" implies that Mr. Broughty is *not* a real lawyer. There is **no substantial truth** to the claim that Mr. Broughty is not a licensed attorney, yet a reasonable reading of Bouzy's tweet implies just that. At most, the tweet "is capable of being assigned more than one meaning, one of which is defamatory and another not," which requires resolution by a fact-finder. *Romaine*, 109 N.J. at 290-91.

These tweets diminish the esteem, respect, good-will or confidence in which Mr. Broughty was held. There is no dispute that these tweets are false. These tweets are defamatory.

**2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was not a licensed attorney and was never a prosecutor.**

Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was not a licensed attorney and was never a prosecutor. As outlined above, Bouzy's tweets amount to his charge that Mr. Broughty was not a licensed attorney and lying that he was. Bouzy points to New York's attorney search system to justify these tweets. He claims that he searched "Nate Broady" in the attorney database and found no results. But the timeline of Bouzy's tweets on September 17, 2022, muddies that claim:

1. Bouzy's first tweet says he cannot locate Mr. Broughty's "bar association number."

2. His second tweet says YouTube should verify professionals' licenses before allowing them to claim they are doctors or lawyers.

3. His third tweet says it is "interesting there is no history of him practicing law anywhere. Maybe the name he is using isn't his real name."

4. His fourth tweet notes that Mr. Broughty's YouTube channel does not list where Mr. Broughty is practicing law.

5. His fifth tweet knocks Mr. Broughty's spelling.

6. His sixth tweet promotes the articles in which Bouzy was featured.

7. His seventh tweet accuses Bouzy of deflecting.

8. His eighth tweet is a screenshot of a comment from a Twitter follower.

9. His ninth tweet states that he cannot find Mr. Broughty in the New York attorney search database, and that Mr. Broughty "might want to retain a lawyer."

10. His tenth tweet: "As expected, it wasn't his real name. He was admitted to the bar in 2016. Not sure why he is using a completely

different name.

See Certification of William P. Reiley ("Reiley Cert."), ¶ 2.[11]

In his third tweet Bouzy acknowledges that maybe "Nate Broady" "isn't his real name." Nevertheless, in his ninth tweet—relying on an attorney search using a name that Bouzy knows might not be his "real name"—Bouzy suggest that Mr. Broughty lawyer up because Mr. Broughty is not an attorney and is falsely claiming he is. Moreover, in his tenth tweet, Bouzy confirms that he "expected" that Nate Broady was not his real name.

In a tweet on the next day, September 18, 2022, Bouzy again confirms that he "expected" that Nate Broady was not Mr. Broughty's real name, but insists that he was "never a prosecutor." Compl. ¶ 79. On that same day, Bouzy admits to already having Mr. Broughty's information, and references back to his "[m]aybe he isn't using his real name" tweet from the day prior. Compl. ¶ 82.

Putting aside that Bouzy tweeted he already had accurate information for Mr. Broughty that he could have used to confirm his attorney licensure status, Bouzy's haphazard "investigation" into the truth or falsity of his weighty charge was not reasonable and, indeed, constituted a reckless disregard for the truth.[12] There was no

---

[11] Found at https://web.archive.org/web/20220918095151/https://twitter.com/cbouzy/status/1571362743222996993

[12] Although defendant cites *Libre By Nexus v. BuzzFeed*, 311 F. Supp.3d 149, 155-58 (D.D.C. 2018), in support of his proposition that "the challenged statements

urgency to the tweets such that Bouzy could not have delayed to further investigate. There was no evident "interest" among the public for Bouzy to publish the tweets— there was only Bouzy's animosity toward Mr. Broughty. And the damage to a lawyer and legal commentator when it is announced to hundreds of thousands of people that he is not a lawyer and lied that he was, was great, and should have caused Bouzy to make a minimal attempt to satisfy himself as to the truth before tweeting the results of his supposed research. All the factors in the Restatement § 580B show Bouzy's actual malice.

Indeed, Bouzy's third tweet recognizing that Nate Broady might not be Mr. Broughty's full name, his ninth tweet confirming he "expected" that it was not his real name, and his tweet revealing that Bouzy in fact had accurate information for Mr. Broughty prior to his defamatory ninth tweet, all show that Bouzy knew his disparaging statement was false, that he recklessly disregarded its truth or falsity.[13]

---

. . . are substantially true because Bouzy could not possibly have found such information about an individual named "Nate Broady," (Def. Br. at 23), that case does not actually support the rule for which it is apparently invoked—i.e., that speech is 'substantially true' when incorrect search terms prevent the speaker from finding information that would refute his eventual assertion.

[13] Regarding defendant's contention that plaintiff cannot establish actual malice because his allegations on that point are conclusory, defendant misstates *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 823 (S.D.N.Y. 2021), as framing the issue solely as "whether a plaintiff 'alleges [any] nonconclusory facts that support the proposition that [defendant] knew that it was reporting falsities." (Def. Br. at 27). In truth, *BYD* recognizes that "[i]t is true that courts typically will infer actual malice from objective facts, in recognition of the fact that a defendant in a

### D. Bouzy Defamed Mr. Broughty When He Tweeted that Mr. Broughty Planted Evidence as a Police Officer.

#### 1. Bouzy's tweets stating Mr. Broughty planted evidence as a police officer were false and defamatory.

Bouzy's tweets stating Mr. Broughty planted evidence as a police officer were false and defamatory. Statements that "impute" the "commission of a crime" are defamation *per se*. *Ward v. Zelikovsky*, 136 N.J. at 526; *Paul v. Davis*, 424 U.S. 693, 697 (1976) (noting that "[i]mputing criminal behavior to an individual is generally considered defamatory [p]er se").[14] Even innuendo suggesting a person has committed a crime can be defamatory. This is true even when the statement merely reiterates that government investigations accused the plaintiff of criminal conduct while also relaying that no indictment resulted. *Barasch v. Soho Weekly News, Inc.*, 208 N.J. Super. 163, 169 (App. Div. 1986).

In *Barasch*, the Appellate Division reversed and remanded for further proceedings the trial court's summary judgment decision that found the defendant not liable for "innuendo" in an article that "imput[ed] [the] commission of a crime, . . . imput[ed] dishonesty, fraud or cheating . . . [and] . . . reflect[ed]

---

defamation action will rarely admit that he published the relevant statements with actual malice. Thus, **that the Complaint is devoid of any nonconclusory allegations does not end the inquiry into whether actual malice is adequately pled**." *Id.* (citations and internal quotations omitted) (cleaned up).

[14] New York law agrees. *Knutt v. Metro Int'l, S.A.*, 938 N.Y.S.2d 134, 137 (2d Dep't 2012) (imputing a serious crime to a person constitutes defamation per se).

adversely on plaintiff's office, business or employment."[15] 208 N.J. Super. at 167-68, 182. The trial court had previously determined that the statements were libelous *per se*, but had mistakenly found that the plaintiff, a former labor union official, was a public figure and based its finding of no liability on that finding. *Id.* at 175, 177-78.

Bouzy tweeted multiple times that Mr. Broughty, as a police officer, planted evidence on innocent people. There is no innuendo or suggestion here—Bouzy states this as an unequivocal fact. These tweets excite adverse, derogatory or unpleasant feelings or opinions against Mr. Broughty, and there is no dispute that these tweets are false. These tweets are defamatory.[16]

### 2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty planted evidence on innocent people.

Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty planted evidence on innocent people. On September 20, 2022, at 9:14 a.m., Bouzy tweeted

---

[15] Bouzy's reliance on *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997), would be misplaced even if New York law applied because it was clear in the book at issue there that the allegedly defamatory statements there "were nothing more than conjecture and speculation," whereas Bouzy here stated repeatedly that Mr. Broughty planted evidence.

[16] For these same reasons Bouzy's tweet accusing Mr. Broughty of "illegally obtaining [Bouzy's] social security number" is readily defamatory and false. Reiley Cert. ¶ 18; Compl. ¶ 107.

that, as a police officer, Mr. Broughty had planted evidence on innocent criminal suspects. Compl. ¶ 92. Bouzy continued that the many innocent people's lives were ruined because of Mr. Broughty's "felony." *Id.* at 95. Bouzy insisted that Mr. Broughty's law license should be suspended. *Id.*

At 11:30 a.m., also on September 20, Mr. Broughty took time to further explain his comments. Mr. Broughty stated unequivocally that he never planted evidence, and dove deeper into his experience as a police officer. At 12:12 p.m. and 12:49 p.m., Bouzy acknowledged watching Mr. Broughty's explanation. Reiley Cert. ¶ 11.[17] At this point, then, Bouzy knows that Mr. Broughty denied, without reservation, planting evidence of any kind on any person at any time.

Still, Bouzy—committed to a course of reckless disregard for the truth—could not help himself:

1. On September 21, Bouzy tweeted that Mr. Broughty was "planting evidence on innocent suspects."
2. On September 22, Bouzy tweeted that Mr. Broughty "falsified evidence when he was a cop."[18]

Reily Cert. ¶¶ 13-14.

Thereafter, on September 29, 2022, Mr. Broughty's counsel served Bouzy with a demand letter to delete the defamatory tweets and retract the statements

---

[17] https://twitter.com/cbouzy/status/1572254077303812096

[18] Bouzy next claimed that Bouzy was planting evidence even prior to being a cop, which was a factual impossibility Bouzy knew about since Bouzy knew Mr. Broughty's work history.

therein. The letter reiterated that Mr. Broughty never planted evidence.[19] It also demanded retractions of other defamatory statements by Bouzy: (i) that Mr. Broughty was never a prosecutor, implying that he was lying about his work experience and qualifications to comment on criminal law as "Nate the Lawyer"; (ii) that Mr. Broughty falsified evidence relating to criminal suspects, a charge whose seriousness needs not be further argued here; and (iii) that Mr. Broughty was stealing money donated for legal fees in connection with this matter, which obviously also reflected falsely on his fitness for both the practice of law and as a legal commentator.

Not to be deterred, Bouzy continued his defamation spree: On October 5, Bouzy tweeted that Mr. Broughty was "laughing about planting evidence." Reily

---

[19] The retraction demand and Mr. Broughty's explanation that he had never planted evidence distinguishes this case from those relied on by Bouzy to argue that it is not a "knowing or calculated falsehood" when the underlying material is "ambiguous." (Def. Br. at 30 (citing *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *Suozzi v. Parente*, 616 N.Y.S.2d 355, 359 (App. Div. 1994)). Both the retraction demand and Mr. Broughty's explanation were decisive, not ambiguous.

Bouzy attempts to argue that he had no obligation to stop the defamatory tweets either after Mr. Broughty's denial or the retraction demand. (Def. Br. at 30-31). Bouzy relies on a series of cases where a defamation plaintiff's denial was not given much weight when the reporter *had other sources*. See *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 660 (1989); *Prince v. Intercept*, 21-CV-10075 (LAP), 2022 WL 5243417, at *2, *16 (S.D.N.Y. Oct. 6, 2022); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 17 CIV. 7568 (PGG), 2018 WL 4735717, at *2 (S.D.N.Y. Sept. 29, 2018). Here, of course, Bouzy's only source *is Mr. Broughty*, thus when Mr. Broughty stated he had never planted evidence, Bouzy was obligated to, at minimum, discontinue tweeting that Broughty had planted evidence.

Cert. ¶ 14. On October 15, Bouzy implied that Mr. Broughty had a tainted record as a police officer. Reily Cert. ¶ 15. After 12:49 p.m. on September 21 (at the latest), Bouzy knew that Mr. Broughty unconditionally denied planting or fabricating any evidence. Thus Bouzy knew at that time and thereafter that his disparaging statements to the contrary were false, or recklessly disregarding their truth or falsity.[20]

### E. Bouzy Defamed Mr. Broughty When He Tweeted that Mr. Broughty was a Grifter.

#### 1. Bouzy's tweets stating Mr. Broughty was a grifter were false and defamatory.

To "grift," according to Merriam-Webster, is "to acquire money or property illicitly." https://www.merriam-webster.com/dictionary/grift   Merriam-Webster defines "illicit" as "not permitted: unlawful." https://www.merriam-webster.com/dictionary/illicitly. "Statements that 'explicitly impute to [a company] fraud, deceit, dishonest, or reprehensible conduct in relation to [a] product' are *per*

---

[20] So too with Bouzy's tweet accusing Mr. Broughty of "illegally obtaining [Bouzy's] social security number." Reiley Cert. ¶ 18; Compl. ¶ 107. Bouzy admitted to watching the October 7, 2022, YouTube video recorded by Mr. Broughty and at no time does Mr. Broughty admit to illegally obtaining Bouzy's social security number. *Id.* Thus Bouzy knew his tweet was false before publishing it. And Bouzy's characterization of his tweet as "accurately report[ing] Plaintiff's statements" is incredible. At no time does Mr. Brought say he "**illegally**" obtained Bouzy's social security number. This is far removed from the discussion in *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 248–52 (2d Cir. 2017), over whether an explosive product was fairly characterized as a bomb, how the product was received, or who uses it). Bouzy's reliance on same does not hold water.

*se* defamatory." *NY Mach. Inc. v. Korean Cleaners Monthly*, 17CV12269SDWLDW, 2018 WL 2455926, at *5 (D.N.J. May 31, 2018) (Wigenton, J.) (quoting *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 296, 302 (D.N.J. 2016)).[21]

In *NY Mach.*, the plaintiffs filed a complaint against the defendant after the defendant stated in its dry cleaning circular that the plaintiffs were "'crooks' and a 'fraud." *Id.* at *1. The defendant was also alleged to have claimed the plaintiffs defrauded their customers by misrepresenting the effectiveness of the plaintiffs' products. *Id.* at *5. The Court ruled that these allegations sufficiently asserted a claim for defamation *per se*. *Id.*

So too do Bouzy's repeated statements that Mr. Broughty was unlawfully acquiring money from his YouTube audience—i.e., that Mr. Broughty was a "grifter"; that Mr. Broughty was soliciting donations to a "legal fund"; and that Mr. Broughty was not putting the donations to the legal fund but instead just "tak[ing] money from people and making himself and [his attorney] richer." Reily Cert. ¶¶ 20-22.[22] Bouzy's numerous tweets to this effect diminished "good-will" or "confidence"

---

[21] New York law does not differ. *Epifani v. Johnson*, 882 N.Y.S.2d 234, 243 (2d Dep't 2009) (imputing the crime of theft to a person constitutes defamation per se).

[22] Bouzy's retort is that "nothing about [his tweets] states or implies that Plaintiff is using those funds for anything *other* than this lawsuit" (Def. Br. at 33), but considering the definition of "grifter" meaning unlawful acquisition of money, and Bouzy's quotes around "legal fund," Bouzy absolutely suggests the money is not for this lawsuit. Also, the term "grifter" is nowhere to be found in *Ganske v.*

in which Broughty was held. These tweets are false and defamatory.

### 2. Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was a "grifter."

Bouzy has a sufficient degree of fault in tweeting that Mr. Broughty was a grifter. Bouzy admits that he watched Mr. Broughty's YouTube video that showed that all money raised went to legal fees and legal costs. Reily Cert. ¶ 20. Nevertheless, Bouzy thereafter accused Mr. Broughty of stealing money, grifting, to make himself and his lawyer richer. Bouzy knew that his disparaging statements were false, or recklessly disregarded their truth or falsity.

### IV.    The Complaint States a False Light Claim Under New Jersey Law.

Under New Jersey law, a plaintiff states a claim for false light invasion of privacy when they allege facts showing that: (1) one "gives publicity to a matter concerning another that places the other before the public in a false light"; (2) "the false light in which the other was placed would be highly offensive to a reasonable person"; and (3) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Romaine*, 537 A.2d at 290 (quoting Restatement (Second) of Torts § 652E). Whereas defamation aims to "protect a person's interest in a good reputation," false light seeks to protect an "individual's peace of mind, *i.e.*, his or her interest 'in not

---

*Mensch*, 480 F. Supp. 3d (S.D.N.Y. 2020), despite Bouzy's citation to it in this section. (Def. Br. at 33).

being made to appear before the public or in an objectionable false light or false position, or in other words, otherwise than as he is.'" *Id.* (quoting W. Keeton, *et al., Prosser and Keeton on the Law of Torts,* § 117, at 864 (5th ed. 1984); Restatement (Second) of Torts § 652E).

Mr. Broughty's Complaint adequately states a claim for false light invasion of privacy. As discussed above, Mr. Broughty has alleged facts that demonstrate: (1) defendant gave publicity to a matter "that places [Mr. Broughty] before the public in a false light"; (2) "the false light in which [Mr. Broughty] was placed"—that he had completely fabricated his career as an attorney and prosecutor and illegally planted evidence when working as a police officer—"would be highly offensive to a reasonable person"; and (3) defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Mr. Broughty] [was] placed." *See Romaine*, 537 A.2d at 290 (quoting Restatement (Second) of Torts § 652E). Thus, Mr. Broughty has stated a claim for false light invasion of privacy under New Jersey law, or alternatively, a claim for defamation by implication under New York law. *See Henry v. Fox News Network LLC*, No. 21-CV-7299 (RA), 2022 WL 4356730, at *10 (S.D.N.Y. Sept. 20, 2022).[23]

---

[23] Despite the implication of defendant's assertions on this point, the Supreme Court has never held that a plaintiff cannot maintain claims for both defamation and false light. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 931 (3d Cir. 1990). Further, defendant's contention that "New York does not

### V.   The Complaint States a Claim for Intentional Interference with Prospective Economic Relationship Under New Jersey Law.

New Jersey law recognizes claims for both intentional interference with prospective economic relationship *and* defamation, and these claims may be brought jointly. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 745 (1989) (ruling that the plaintiff's complaint stated a claim for both intentional interference with prospective economic relationship and defamation).

Bouzy argued for dismissal only on the basis that these two claims are duplicative. Because these claims are not duplicative under New Jersey law, Bouzy's argument fails and his motion should be denied.[24]

### CONCLUSION

For all these reasons, plaintiff Nathaniel Broughty respectfully requests that the Court deny defendant Christopher Bouzy's motion to dismiss the complaint for failure to state a claim in its entirety.

---

recognize a separate cause of action for false light/invasion of privacy" is highly misleading: New York law **does** permit recovery for facts that would support a false light claim in other jurisdictions, but under the "analogous . . . claim for defamation by implication." *Henry*, 2022 WL 4356730, at *10. In any event, as stated above, this case is properly decided under New Jersey law.

[24] If the Court were going to grant dismissal, Bouzy's request for a dismissal with prejudice is errant in any event. Leave to amend shall be freely given under Rule 15(a), for which "[l]iberality is the keystone." *Prof'l Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161, 165 (3d Cir. 2007). Amendment "should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay." *Adams v. Gould Inc.,* 739 F.2d 858, 867–68 (3d Cir.1984).

DHILLON LAW GROUP INC.
A California Professional Corporation

By: _/s/ Ronald D. Coleman_____
          Ronald D. Coleman

Josiah Contarino
50 Park Place, Suite 1105
Newark, New Jersey 07102
917-423-7221
rcoleman@dhillonlaw.com
jcontarino@dhillonlaw.com
*Attorneys for Plaintiff*

Dated: February 6, 2023