**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATHANIEL J. BROUGHTY, | Civil Action No. 22-6458 (SDW) (JRA) |
| Plaintiff, | **OPINION** |
| v. | August 7, 2023 |
| CHRISTOPHER E. BOUZY, | |
| Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Defendant Christopher E. Bouzy's ("Defendant") Motion to Dismiss (D.E. 10) Plaintiff Nathaniel J. Broughty's ("Plaintiff") Complaint (D.E. 1 at 8–52) ("Compl.") for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. §1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons discussed below, Defendant's Motion to Dismiss is **GRANTED**.

I.  BACKGROUND AND PROCEDURAL HISTORY

  A.  Plaintiff's Factual Allegations[1]

Plaintiff is a former University Police Officer of the City of New York, a member of the New York Bar, a former Bronx County Assistant District Attorney, and former law school instructor who created and operates a YouTube channel under the name "Nate the Lawyer." (Compl. ¶ 1.) Defendant is the chief executive officer of Bot Sentinel, Inc., a New Jersey

---
[1] For purposes of the present Motion, the facts are drawn from the Complaint and accepted as true. *See Fowler v. UMPC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

1

corporation that purports to fight disinformation and harassment on Twitter. (*Id.* ¶ 3, 44.) Plaintiff is a resident of New York, and Defendant is a resident of New Jersey. (*Id.* ¶ 3; D.E. 12 at 17.)

Plaintiff's YouTube channel, which was founded in 2014, has approximately 255,000 subscribers and has attracted millions of viewers. (Compl. ¶ 2.) It publishes pre-recorded videos as well as "livestreams" in which viewers watch a video program in real time with the option to participate in a running stream of commentary that is visible to all participants in a chat window shown next to the video. (*Id.* ¶¶ 6–8.) Viewers can pay to have their chat comments rise to the top of the chat window, or stay pinned to the screen for certain amounts of time, making it more likely that the host will respond to them. (*Id.* ¶¶ 9–10.) Popular livestream hosts can generate significant income through these paid comments and other monetization mechanisms offered by YouTube. (*Id.* ¶ 11.)

Plaintiff is part of an informal group of experienced lawyers with law-oriented YouTube channels, referred to as "LawTube," who livestream legal commentary and discussion, often appearing on one channel as a group. (*Id.* ¶ 12.) Among other content, LawTube hosts have livestreamed sensational trials that were video recorded for public viewing, including the criminal trial of Kyle Rittenhouse and the defamation trial between formerly married celebrities Johnny Depp and Amber Heard. (*Id.* ¶¶ 14–15, 17.) The popularity and revenue generated by these livestreams depend in large part on how potential viewers perceive the host's experience, professional knowledge, and—above all—credibility. (*Id.* ¶ 16.)

Bot Sentinel, which Defendant founded in 2018, describes itself as a "non-partisan platform developed to classify and track inauthentic accounts and toxic trolls" on Twitter to "fight

disinformation and targeted harassment" on that platform.[2] (*Id*. ¶¶ 44–45.) It reviews Twitter accounts it considers "suspicious," including both automated accounts, known as "bots," and human-controlled accounts it calls "trollbots," which it defines as accounts that "exhibit toxic troll-like behavior" such as retweeting "propaganda and fake news" or engaging in "repetitive bot-like activity." (*Id*. ¶¶ 45–48.) It then rates these accounts in a publicly available database—as either normal, satisfactory, disruptive, or problematic—and tracks their activity daily. (*Id.* ¶¶ 45–46, 55.) Bot Sentinel solicits donations on its website and has also been paid by clients, including Megan Markle, Pete Buttigieg, and Amber Heard. (*Id*. ¶ 41–42, 68–69.) Between July 2020 and July 2022, newspaper articles cited Bot Sentinel's research in reporting that numerous Twitter accounts had been created specifically to target Heard and her supporters' Twitter accounts with hateful comments and threats. (*Id*. ¶¶ 61–69.) Heard paid Bot Sentinel for a report that found she was "subjected to one of the worst cases of cyberbullying" during the trial, as stated in a July 2022 newspaper headline. (*Id*. ¶¶ 70–71.)

In September 2022, Defendant and Bot Sentinel turned their attention to Plaintiff and other LawTubers who had streamed the Depp–Heard trial. (*Id*. ¶ 72.) The LawTubers, despite their diverse political views and backgrounds, were virtually unanimous in their opinion that Heard was not credible in her defense against Depp's defamation claims. (*Id*. ¶¶ 18, 23–27, 72.) Some LawTubers, including Plaintiff, had also expressed views critical of Bot Sentinel's claims of widespread, coordinated attacks on Heard on social media. (*Id*. ¶ 73.) Through his personal Twitter account, Defendant demanded that YouTube delete some LawTubers accounts for "troll-like behavior" he deemed inappropriate, including spreading propaganda and fake news. (*Id*.

---

[2] In this context, to "troll" or to be a troll means "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content." *Troll*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/troll (last visited August 7, 2023).

¶ 74.) On or before September 19, 2022, Bot Sentinel rated Plaintiff's Twitter account "disruptive." (*Id.* ¶ 57.)

On September 17, 2022, Defendant posted a number of tweets about Plaintiff, some of which he later deleted, in which he questioned Plaintiff's credentials. (*Id*. 75–76.) For example, he stated that he could not tell if Plaintiff was a "legit lawyer or just a social media lawyer" and that he could not find Plaintiff in "the database where he claims he practices law" or find the news articles that Plaintiff claimed to be featured in. (*Id*. ¶ 76.) He tweeted that "there is no history of [Plaintiff] practicing . . . anywhere. Maybe the name [Plaintiff] is using isn't his [real name]." (*Id*. ¶ 82.)

The following day, Defendant conceded that Plaintiff was a lawyer, and shared records of Plaintiff's status as a New York attorney. (*Id*. ¶¶ 79, 81–82.) He also admitted that, when he made an earlier claim about not being able to find any record of Plaintiff practicing law, he "already had the information" but was "waiting for someone else to tweet it" so he would not be accused of inappropriately sharing Plaintiff's real name on social media. (*Id*. ¶ 82.) In the same tweet in which Defendant admitted Plaintiff was in fact a lawyer and had been a police officer, he insisted that Plaintiff was "never a prosecutor" as he claimed. (*Id*. ¶ 79.) Defendant later admitted that this, too, was not true. (*Id*. ¶¶ 83–85.)

Defendant made statements accusing Plaintiff of criminal conduct, or suggesting that he had engaged in criminal conduct. He tweeted that Plaintiff had "bragged to his @YouTube followers about illegally obtaining [ Defendant's] social security number." (*Id*. ¶ 107.) He called Plaintiff a "grifter" and a "[p]rofessional liar," and suggested that Plaintiff had used donations from his followers for this legal action to make himself and his lawyer richer. (*Id*. ¶¶ 84, 107–09.) He accused Plaintiff and others of starting a "coordinated smear campaign" against Bot Sentinel. (*Id*.

4

¶ 107.) Most seriously, on September 20 and 21, 2022, Defendant posted a series of tweets stating that Plaintiff had admitted in a video "he planted evidence as a cop" and that he "knew when cops brought suspects in with bogus evidence when he was an ADA." (*Id.* ¶¶ 92–100.) He tweeted a link to the video along with his initial statement describing it, and later tweets—in which he debated the meaning of Plaintiff's words in the video with other Twitter users—referred to the video, *e.g.*, by stating that Plaintiff "admitted to a felony on camera." (*Id.* ¶ 92, 96–98.)

On September 21, 2022, Plaintiff, through counsel, transmitted a letter to Defendant demanding that Defendant cease and desist from defaming Plaintiff, and that Defendant delete any defamatory tweets still online. (*Id.* ¶ 102; D.E. 1 at 48.) Defendant issued a series of tweets in response to the letter, stating that he and Bot Sentinel would not comply with Plaintiff's demands and encouraging Plaintiff to file a lawsuit. (Compl. ¶ 104.) Defendant reiterated his statements that Plaintiff admitted he had falsified evidence as a police officer in a video, with a link to the video included in the same tweet. (*Id.* ¶ 105.) Defendant expressed amusement at Plaintiff's lawyer's contention that Plaintiff "had a spotless record when he was a Campus Peace Officer" at the City University of New York. (*Id.* ¶ 106.) In still more tweets, Defendant attacked Plaintiff's character in other ways. He stated that Plaintiff was "the type that would insult Black women so he could fit in with his Caucasian peers," that he was "not comfortable in his own skin," and that he attacked Defendant to receive attention because he "desperately wants to be relevant." (*Id.* ¶ 89.) Defendant's Twitter account gained followers during the period in which he criticized Plaintiff. (*Id.* ¶ 87.)

**B.     Procedural History**

Plaintiff filed this lawsuit on October 28, 2022, in the Superior Court of New Jersey, Law Division, Hudson County. (D.E. 1 at 8–52.) The Complaint asserts that Defendant's statements,

5

described above, constitute defamation *per quod* (First Claim), defamation *per se* (Second Claim), a false light tort (Third Claim), and intentional interference with a prospective business advantage. (Fourth Claim). (Compl. ¶¶ 111–31.) Defendants timely removed the suit to this Court on November 4, 2022, based on diversity jurisdiction. (D.E. 1.) Defendant subsequently filed the instant motion to dismiss, and the parties have completed briefing. (D.E. 10, 12, 13.)

## II. <u>LEGAL STANDARD</u>

An adequate complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).[3] This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). A claim for relief must be "plausible" and a complaint will not survive a motion to dismiss if the "well-pleaded facts do not permit the court to infer more than the mere possibility" of defendant's liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (noting that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7

---

[3] This Court applies the ordinary federal pleading standard in this diversity action. Defendant does not, as Plaintiff suggests, invoke any heightened pleading standard applicable in New York courts requiring a "substantial basis." (*See* D.E. 12 at 21–22; D.E. 13 at 6 n.3.) To the extent New York requires defamation pleadings to show a "substantial basis," that heightened pleading standard would conflict with Rule 8's pleading requirements and thus would not govern here. *See La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020) (finding a state anti-SLAPP statute does not apply in federal court insofar as it conflicts with the Federal Rules of Civil Procedure).

(3d Cir. 2002)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (discussing the *Iqbal* standard). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III. DISCUSSION

#### A. Choice of Law

At the outset, this Court decides which state's laws govern the substantive issues in this case using New Jersey's choice-of-law rules. *Warriner v. Stanton*, 475 F.3d 497, 500 (3d Cir. 2007). New Jersey courts apply the tort law of the state with "the greatest interest in governing the particular issue" and generally follow the Restatement (Second) of Conflict of Laws (the "Restatement"). *Id*. (quoting *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J.1986)).

Pursuant to § 150 of the Restatement, entitled "Multistate Defamation," when a person claims to have been defamed by an "aggregate communication" such as a newspaper publication or television broadcast which is aired in more than one state, courts should apply the law of the state "where the person was domiciled at the time, if the matter complained of was published in that state." Restatement (Second) of Conflict of Laws § 150 (Am. L. Inst. 1971); *see Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 766 (D.N.J. 1981) (applying § 150 in a multistate defamation case). Comment *e* further explains that the reason for this is that defamation laws "are designed to protect a person's interest in his reputation." Restatement § 150 cmt. e. Thus, a state other than the state of the plaintiff's domicile "may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his

7

reputation," for example, where "the plaintiff is better known in this state than the state of his domicil[e]." *Id*.

Plaintiff is domiciled in New York, and he does not assert that the alleged defamatory statements—which were published to a global audience on Twitter—caused him greater injury in New Jersey than in New York. Plaintiff concedes that his injury was suffered "nationwide," and he does not claim any special connection to New Jersey, while New York is the state of his residence and the place where he has practiced law and worked as a police officer and prosecutor. (D.E. 12 at 22, 26; Compl. ¶ 1.) Thus, New York is the place where Plaintiff's reputation would most likely be injured by defamatory statements on Twitter, so New York law governs the substantive issues in this case. *See* Restatement §150; *Cibenko*, 510 F. Supp. at 766.

**B.      False Light (Third Claim)**

Because New York law applies here, Plaintiff's "false light tort" claim is dismissed with prejudice, since "neither a false light claim nor any other common-law privacy tort exists in New York." *Porco v. Lifetime Entm't Servs., LLC*, 150 N.Y.S.3d 380, 386 (N.Y. App. Div. 3rd Dep't 2021) (citing *Messenger v. Gruner + Jahr Printing & Publ'g*, 727 N.E.2d 549, 556 (N.Y. 2000)); *see Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 151 (S.D.N.Y. 2022). Plaintiff does not dispute this fact, and only seeks to bring this claim under New Jersey law. (D.E. 12 at 46–47.) Plaintiff briefly argues that the same underlying facts support a "defamation by implication" claim under New York law, but he did not assert such a claim in his Complaint. (*Id.* at 47–48 n.23.) In any event, for the reasons explained below, his Complaint lacks sufficient facts to state a defamation claim.

8

### C. Defamation (First and Second Claims)

#### 1. New York Law

Defamation is the making of a false statement "that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace." *Thomas H. v. Paul B.*, 965 N.E.2d 939, 942 (N.Y. 2012). Defamatory statements expressed in writing or print are also referred to as libel. *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). A claim for libel in New York has five elements: (1) "a written defamatory statement of fact concerning the plaintiff"; (2) "publication to a third party"; (3) "fault (either negligence or actual malice depending on the status of the libeled party)"; (4) "falsity of the defamatory statement"; and (5) "special damages or per se actionability." *Id.*; *see Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 41–42 (N.Y. App. Div. 1st Dep't 2014).

"Since falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false," a defamation or "libel action cannot be maintained unless it is premised on published assertions of *fact*." *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). Statements of opinion are not actionable, "no matter how offensive." *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."). The only type of opinion that is actionable is one that "implies that it is based upon facts which justify the opinion but are unknown [or undisclosed] to those reading or hearing it." *Davis*, 22 N.E.3d at 1004 (quotation marks omitted); *see also Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) (stating that accusations of criminality would not be actionable "if the facts on which they are based are fully and accurately set forth and it is clear . . . that the accusation is merely a personal surmise built

upon those facts"). Opinions based on *disclosed* facts are protected First Amendment speech, because "[w]hen an article discloses the underlying facts, readers can easily judge the facts for themselves." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020).

Whether a statement is fact or opinion is a question of law that turns on whether a "reasonable reader" could consider the statement to be conveying a fact. *Davis*, 22 N.E.3d at 1004–05. This analysis depends in large part on the context in which the statement is made. *Brian*, 660 N.E.2d at 1129. "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made," including the forum, to determine how a reasonable reader would view them. *Id.* at 1130. Taking context into account, the New York Court of Appeals has held that statements made at a public hearing were not actionable defamation because "[r]easonable listeners come to a public hearing with expectations that the speaker is airing a layperson's opinion," and because a person who is defamed at a public hearing has the remedy of "self-help"—that is, the "immediate opportunity to air his competing view." *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 934, 937 (N.Y. 1992) (citing *Gertz,* 418 U.S. at 344). Courts applying New York law, mindful of the First Amendment, "should be reluctant to employ their powers to correct errors uttered in the give-and-take of live public debate when there is reason to believe that the give-and-take itself can adequately, and more appropriately, remedy the wrong." *Id.* at 934.

Where the plaintiff is a public figure, the First Amendment requires that he demonstrate the allegedly defamatory statement was made with "actual malice"—that is, "with either knowledge that it was false or reckless disregard for the truth." *Gottwald v. Sebert*, 2023 WL 3959051, at *2, — N.E.3d — (N.Y. 2023) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964)); *see Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

An otherwise private individual who is not a household name may be a limited-purpose public figure if he "has taken an affirmative step to attract public attention." *James v. Gannett Co.*, 353 N.E.2d 834, 840 (N.Y. 1976); *see Gottwald*, No. 32, 2023 WL 3959051, at **2–3 (overturning lower court's ruling that a music producer who purposefully sought media attention was not a public figure). The actual malice inquiry is "a subjective one, focusing on the state of mind of the publisher of the allegedly libelous statements at the time of publication." *Kipper v. NYP Holdings Co.*, 912 N.E.2d 26, 30 (N.Y. 2009).

### 2. Analysis

Plaintiff is required to show actual malice because he is a limited-purpose public figure. He purposefully sought public attention and followers by creating YouTube and Twitter content on matters of public interest, including analysis of the Depp–Heard trial and criticisms of Bot Sentinel. (Compl. ¶¶ 1–2, 6, 16–20, 72–73.) Videos on his YouTube channel, which was created to "make the law more accessible to people," have been viewed more than 27 million times. (Compl. ¶ 2.) *See McCafferty*, 955 F.3d 352, 359 (finding individual who posted political videos on Facebook was a limited-purpose public figure).

Plaintiff's defamation claims fail because he has not sufficiently alleged that Defendant made any false statement of fact with knowledge that it was false or with a reckless disregard for the truth. Crucially, the "over-all context" in which the alleged defamation occurred here is Twitter. As both parties are well aware—given that both have engaged in calling out mistruths on the Internet—Twitter is a public forum where a reasonable reader will expect to find many more opinions than facts. *See Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015) ("New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." (collecting cases)); *See Franklin v. Daily*

*Holdings, Inc.*, 21 N.Y.S.3d 6, 12–13 (N.Y. App Div. 1st Dep't 2015) (noting that a tweet does not give the same impression of truth as a newspaper article). Moreover, Twitter is a forum where a user, "in the same setting and with the same audience, has the immediate opportunity to air his competing view" and thus may generally remedy any defamation with "self-help" rather than rely on litigation. *600 W. 115th St. Corp.*, 603 N.E.2d at 934. This is especially true here, where Plaintiff was an avid user of this platform with many followers, and thus had "'significantly greater access to the channels of effective communication' than his peers." *McCafferty*, 955 F.3d at 359 (quoting *Gertz*, 418 U.S. at 344).

<u>Tweets Challenging Plaintiff's Credentials</u>

Several of Defendant's tweets question Plaintiff's credentials, including tweets regarding whether Plaintiff was in fact an attorney and former prosecutor. (Compl. ¶¶ 75–79.) Among these, the only one that a reasonable reader might view as a statement of fact is Defendant's statement that Plaintiff "was never a prosecutor." (*Id.* ¶ 79.) However, Plaintiff fails to plead facts showing that Defendant made this statement with actual malice, so none of the tweets concerning Plaintiff's credentials are actionable defamation.

Defendant's tweets questioning whether Plaintiff was a lawyer are protected First Amendment speech because a reasonable reader would only view them as opinions, and the facts upon which they were based were disclosed, so "readers can easily judge the facts for themselves." *McCafferty*, 955 F.3d at 357; *see Davis*, 22 N.E.3d at 1004; *Gross*, 623 N.E.2d at 1169. Defendant's first statement inferring that Plaintiff was not a "real lawyer" was plainly based on the fact that he "[couldn't] find [Plaintiff] in the database where he claims he practices law," and this tweet included a link to the New York Courts website. (Compl. ¶ 76.) Plaintiff concedes that the name he used on social media was not his real name, so that it was not false for Defendant to

12

say he could not locate Plaintiff's bar number or find him in the attorney database. (D.E. 12 at 36.) A number of Defendant's tweets alluded to the fact that Plaintiff might not be using his real name on social media or that there was "sure[ly] . . . a reasonable explanation for why" he did not appear in the attorney database, giving the reader of these tweets even less reason to believe that Defendant was stating a fact when he suggested Plaintiff was not a lawyer. (Compl. ¶¶ 76–82.)

Plaintiff alleges that the day after posting these tweets, Defendant corrected the record after "having learned that Mr. Broughty is, in fact, a New York attorney," but that he later "explained" in a tweet that he had tweeted the prior statements about Plaintiff not appearing to be a lawyer "knowingly and willfully." (Compl. ¶¶ 79, 82.) However, the tweet that purportedly explains this is not so clear. (*Id.* ¶ 82.) Defendant, referencing back to an earlier tweet in which he said there was "no history of him practicing" and that "[m]aybe the name he is using isn't his real name," stated that he "already had the information." (*Id.*) This statement does not demonstrate that Defendant knew at the outset that Plaintiff was in fact a lawyer under another name. Moreover, it is unclear what "information" he had—assuming that the information was Plaintiff's real name, Defendant's statement that there was "no history of him practicing" is still substantially true with regard to the social media persona he was apparently referencing. (*Id.*)

In the same tweet in which Defendant admitted that Plaintiff in fact "was a cop, and . . . became a lawyer in 2016," he added that Plaintiff "was never a prosecutor." (*Id.* ¶ 79.) This tweet included a screenshot of an "Attorney Detail Report" from the New York Courts website dated 2022 with blocks of the text blacked out. (*Id.*) A reasonable reader could believe that Defendant derived all of the stated information about Plaintiff's career history from this page, which was not all visible to the reader, and thus that Defendant's statement that Plaintiff "was never a prosecutor" was a statement of fact or an opinion based in part on undisclosed facts. (*Id.*) This statement was

13

false. (Compl. ¶¶ 1, 84.) However, Plaintiff does not allege any facts showing that Defendant knew this statement was false at the time it was published or that he made it with reckless disregard for the truth. *Kipper*, 912 N.E.2d at 30. The Complaint demonstrates that Defendant had some regard for the truth, as he deleted older tweets with misstatements and, even in the same tweet containing this statement, he corrected some of his prior misstatements. (Compl. ¶¶ 76, 79, 84.) Plaintiff alleges that Defendant ultimately "conceded the falsity of his claims about [P]laintiff's background and credentials." (Compl. ¶ 83.) Accepting these alleged facts as true, they do not establish Defendant's actual malice at the time of publication. *Kipper*, 912 N.E.2d at 30.

Tweets Accusing Plaintiff of Criminal Conduct

Defendant's tweets contending or suggesting that Plaintiff committed crimes are also statements of opinion, so they cannot form the basis of a defamation claim. *Davis*, 22 N.E.3d at 1004. (Compl. ¶¶ 92–109.) Defendant's tweets describing Plaintiff as a "grifter," "liar," "troll," or participant in a "smear campaign" are clearly opinions in the context in which they were stated, and none of Defendant's tweets making these remarks imply that they are based on undisclosed facts. *Id*. (Compl. ¶¶ 84, 107–09.)

Defendant's more direct accusations of criminal conduct cannot constitute defamation because they disclosed the facts upon which they were based. (Compl. ¶¶ 92–100, 105, 107.) *See Gross*, 623 N.E.2d at 1169; *Davis*, 22 N.E.3d at 1004. Defendant began the string of tweets about planting evidence with the words "New: Unearthed video of [Plaintiff] admitting he planted evidence" and a link to the video referenced, and his subsequent tweets continued to debate what Plaintiff's words in the video meant, making it clear to the reasonable reader that his statements accusing Plaintiff of criminal conduct were "merely a personal surmise built upon" what Plaintiff said in this video. *Gross*, 623 N.E.2d at 1169. Similarly, Defendant's tweet stating that Plaintiff

14

"bragged to his @YouTube followers about illegally obtaining [Defendant's] social security number" contained a link to a YouTube video. (*Id*. ¶ 107; D.E. 10-2 at 48 nn. 26–27.) Readers were free to, and apparently many on Twitter did in fact, reach different conclusions as to whether Plaintiff admitted to any criminal conduct in these videos. *See McCafferty*, 955 F.3d at 357.

Other Tweets Criticizing Plaintiff

Defendant's other tweets cited in the Complaint, though offensive, are nonactionable opinions because a reasonable reader would not believe them to be conveying facts, especially in the broader context in which they were made: the parties sparring on Twitter. (*See* Compl. ¶¶ 84, 89, 106–07.) *See Brian*, 660 N.E.2d at 1130; *600 W. 115th St. Corp.*, 603 N.E.2d at 934, 937; *Gertz,* 418 U.S. at 344.

### D.    Intentional Interference with Prospective Business Advantage (Fourth Claim)

Plaintiff fails to dispute that his claim for intentional interference with a prospective business advantage is duplicative of his defamation claims under New York law in the instant circumstances, merely arguing that New Jersey law allows such claims to proceed together with a defamation claim. (D.E. 12 at 48.) In any event, he has not pled facts sufficient to support this claim.

Plaintiff does not allege that Defendant interfered with any specific contract or binding business relationship, so this claim is construed as a claim for interference with nonbinding existing or prospective economic relations. *See Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). To state a claim based on interference with a nonbinding relationship, the plaintiff must generally show that "the defendant's conduct [amounted] to a crime or an independent tort" unless the defendant acted with "the sole purpose of inflicting intentional harm" on the plaintiff.

*Id*. (quotation marks omitted); *see Jacobs v. Continuum Health Partners, Inc.*, 776 N.Y.S.2d 279, 280 (N.Y. App. Div. 1st Dep't 2004).

Plaintiff has not sufficiently alleged that Defendant's actions amounted to a crime or tort, and his conclusory allegations that Defendant's actions were all part of a "campaign" to cause social media platforms "to limit, restrict, or eliminate [Plaintiff's] access or ability to profit from publication of content on such platforms" are insufficient to demonstrate that Defendant acted with the sole purpose of inflicting harm on Plaintiff.  (Compl. ¶ 129.)  The Complaint itself alleges that Defendant had other motivations for making false statements: he was "offended by the criticism" of Heard and of Bot Sentinel's reports; he wanted to promote himself and advertise Bot Sentinel; and he wanted to attract a broader audience of followers and potential donors on social media. (Compl. ¶¶ 72–74, 77–78, 87, 100.)

## II.   CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED**, Plaintiff's First, Second, and Fourth Claims are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, except insofar as they are based on statements which are nonactionable opinions, and Plaintiff's Third Claim is **DISMISSED WITH PREJUDICE** for failure to state a claim.  Plaintiff shall have thirty (30) days to file an amended complaint.  An appropriate order follows.

                                                   /s/ Susan D. Wigenton  
                                        **SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk  
cc:     Parties  
        José R. Almonte, U.S.M.J.