**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATHANIEL J. BROUGHTY,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER E. BOUZY,<br><br>Defendant. | Case No.: 22-6458-SDW-JRA<br><br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Nathaniel J. Broughty, by and through the undersigned attorneys, sets forth, upon information and belief, the following:

**THE PARTIES**

1.      Plaintiff Nathaniel Broughty is a former University Officer of the City of New York, New York County Assistant District Attorney, and law school instructor. Mr. Broughty is currently a member of the New York Bar and operates a YouTube channel under the name "Nate the Lawyer,"  which can be found at https://www.youtube.com/c/NateTheLawyer (the "Nate the Lawyer Channel").

2.      Defendant Christopher Bouzy is the founder of Bot Sentinel which is an online platform fighting false information intended to mislead the public. Defendant has been repeatedly identified by multiple academic journals and most major press outlets as the leading expert in his field in both detecting and identifying false and misleading information on Twitter. Defendant has been cited by numerous academic articles, research and development firms, news organizations, and mainstream media publications such as the L.A. Times, NBC News, and The Washington Post.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

4.      5. Venue is proper under 28 U.S.C. § 1391(b)(1) because the only Defendant resides in this District.

**FACTS APPLICABLE TO ALL CLAIMS**

**Background**

5.      The Nate the Lawyer Channel is known for its livestreams and pre-recorded videos, which are transmitted over the internet and cover legal topics. Mr. Broughty has previously operated under the stage names of Nate Lawyer, MP, and Nate Broady.

6.      YouTube livestreams are sessions where Mr. Broughty provides real-time, live coverage of events of widespread interest. During livestreams, viewers can pay to have their chat comments elevated to the top of a chat window or remain pinned to the screen for certain durations.

7.      Mr. Broughty also publishes pre-recorded videos in which viewers can watch and comment on various topics.

8.      Popular livestreams and pre-recorded videos can generate significant income through paid comments, ad revenue based on views, and other monetization methods offered by YouTube.

9. Viewers are drawn to Mr. Broughty's work due to his reputation and expertise. False factual claims against his reputation and expertise have a direct and substantial impact on his professional reputation.

10. Mr. Broughty is a member of an informal group of seasoned lawyers with law-oriented YouTube channels, collectively known as "LawTube"; they livestream legal commentary and discussions, often featuring on one channel as a group.

11. Mr. Broughty's content delves into both unique and familiar aspects of the law, assisting viewers in comprehending intricate legal matters.

12. For instance, Mr. Broughty has discussed the emerging trend of online defamation cases stemming from social media.

13. Mr. Broughty has covered cases such as Elon Musk's defamation trial over a tweet about Vernon Unsworth, which read "never saw this British expat guy," followed by "Sorry pedo guy, you really did ask for it." The case proceeded to trial after Musk's motion to dismiss the action was denied, and Musk now owns Twitter which he has rebranded as "X."

14. Other cases he has covered include Donald Trump being found liable for defamation over a social media post on his Twitter-like platform, Truth Social, in New York, and the Johnny Depp and Amber Heard trial where liability was premised on Amber Heard's retweet of a Washington Post op-ed.

15. Mr. Broughty's popularity hinges largely on the perception of his credentials, experience, professional knowledge, and most importantly, credibility by potential viewers.

16. Defendant Christopher Bouzy is considered by academics and the media to be an expert in identifying false and misleading information intended to mislead the public online and specifically on Twitter.

17.    Founded in 2018 by Defendant, Bot Sentinel claims to be a non-partisan platform with the goal of identifying and monitoring fake accounts, toxic trolls, and countering false and inaccurate information online intended to mislead the public on Twitter.

18.    Defendant reviews Twitter accounts he deems "suspicious," which includes both automated accounts, known as "bots," and human-controlled accounts it labels "trollbots."

19.    These "trollbots" are defined as accounts that display "toxic troll-like behavior," such as retweeting "propaganda and fake news" or participating in "repetitive bot-like activity."

20.    Bot Sentinel then rates these accounts in a publicly accessible database—as either normal, satisfactory, disruptive, or problematic—and monitors their activity daily.

21.    Upon information and belief, Bot Sentinel solicits donations on its website and has also been compensated by clients, including Megan Markle, Pete Buttigieg, and Amber Heard.

22.    Defendant is perceived as one of the foremost experts in the field of researching and identifying false and inaccurate information online, particularly on Twitter.

23.    Defendant's reputation as one of the top experts in this field is strengthened by his work and/or tweets being referenced in numerous academic journals such as in the National Academy of Sciences (NAS), National Institute of Health's (NIH) National Library of Medicine, the American Sociological Association, Journal of Disaster Risk Reduction and Montclair State University Digital Commons to name a few.

24.    In total, Defendant has been cited in multiple academic journals both nationally and internationally for his perceived expertise in researching and identifying false and inaccurate information online, particularly on Twitter.

25.    Defendant's work has also been cited and promoted by the RAND Corporation, one of America's leading policy think tanks and research institutions.

26.     Along with some of the most prominent academic institutions in the world, Defendant's tweets and/or work have been cited as an authority in the field of researching and identifying false and inaccurate information online, particularly on Twitter by the L.A. Times, NBC News, CBS News, ABC News, and many more.

27.     Defendant's tweets are distinct from those of average Twitter users because Defendant's career and reputation is that of an expert in detecting and combating false and misleading information on Twitter. His respected reputation and expertise in recognizing deceptive content on the platform set him apart.

28.     Defendant's Twitter account holds a notable place as a reliable source of true and factual information cited by academic research institutions and major media outlets both in print and television.

29.     Because of Defendant's perceived highly respected reputation in the field, Defendant's work was featured in a Netflix documentary entitled *Harry and Meghan*, which was watched by over 80 million people.

30.     Amber Heard's legal team also commissioned Defendant's company Bot Sentinel for a report, and his analysis as a purported expert was cited extensively during the *Depp v. Heard* defamation trial.

31.     In September 2022, Defendant and Bot Sentinel shifted their focus to Mr. Broughty and other LawTubers who had streamed the Depp–Heard trial. Despite their varied political views and backgrounds, the LawTubers were almost unanimously of the opinion that Heard lacked credibility in her defense against Depp's defamation claims.

32.     Some LawTubers, including Mr. Broughty, voiced criticisms of Bot Sentinel's assertions regarding widespread, coordinated attacks on Heard on social media. In response,

Defendant, using his prominent Twitter account, called for YouTube and Twitter to remove certain LawTubers' accounts due to what he labeled as "troll-like behavior," such as disseminating propaganda and false news.

33.    Defendant has previously succeeded in having YouTube channels and Twitter accounts removed after identifying them as spreading false and inaccurate information intended to mislead the public.

34.    When Defendant flags information as false and misleading on Twitter, the public takes notice. Hailed as a leading authority in the field by both academia and established traditional media, his evaluations published on Twitter are deemed nothing short of well researched, authoritative, and trustworthy, with the impression of truth.

### Defendant Implies Mr. Broughty Spread Misinformation & Denies Avenues for Redress

35.    On or before September 19, 2022, Defendant rated Mr. Broughty's Twitter account as "disruptive."

36.    Defendant not only blocked Mr. Broughty on Twitter but also all of his followers. This strategic move kept Mr. Broughty in the dark, unable to counter any false or misleading claims immediately. Essentially, Mr. Broughty was denied the "self-help" means to address these accusations before the same audience.

37.    By intentionally blocking Mr. Broughty, Defendant ensured that any knowledge of the defamatory statements was delayed. When Mr. Broughty finally became aware through third parties, the window for meaningful self-correction had closed, as the damage to his reputation had already taken hold. This act was a calculated decision by Defendant to obstruct Mr. Broughty from addressing the defamation directly.

38.     Defendant's Twitter account boasts 350,000 followers, dwarfing Mr. Broughty's following of 70,000 by sevenfold. This vast disparity in audience size effectively eliminated any realistic opportunity for Mr. Broughty to counteract or address the defamatory tweets in a manner that would reach the same scale of audience to which the harmful messages were disseminated.

39.     On September 17, 2022, Defendant, regarded as the foremost expert in detecting online false information, tweeted falsehoods about Mr. Broughty in which he implied that Mr. Broughty was neither licensed nor a "real" attorney. Defendant has since deleted some of these tweets, but many remain publicly available.

40.     For instance, Defendant said that there must be a reasonable explanation for his inability to find Mr. Broughty's former YouTube Channel name in the court's database, implying he wasn't an attorney, and endorsed the defamatory inference by stating that he "might want to retain a real lawyer."



41.     Defendant—who, again, is regarded as a top expert in researching and detecting online falsehoods—stated that Mr. Broughty might not be a "legit lawyer" because he couldn't

find Mr. Broughty's credentials despite his superior expertise in the field. Defendant's reputation as an authoritative source provided the implication with apparent authoritative weight.



42.  Defendant persisted in his false implication that Mr. Broughty was not a genuine attorney and was lying about his qualifications and credentials.

43.  Defendant's stated inability to locate Mr. Broughty's bar association number or any other evidence confirming his ability to practice law was given more credibility because of Defendant's recognized expertise and reputation in the field of researching and identifying false and misleading information on Twitter.



44.     Because of Defendant's reputation and expertise in both researching and identifying false and inaccurate information intended to mislead the public on Twitter, other Twitter users stated their belief that Mr. Broughty was not a real lawyer. Repeatedly, Defendant <u>explicitly endorsed</u> the defamatory inference that Mr. Broughty was not a licensed attorney, and that he was violating the law by representing himself as one.



45.     The following day, September 18, 2022, Defendant faced challenges from other users on the platform.

46.     This was due to the easy accessibility of Mr. Broughty's real name and credentials, which were readily available to the public on Twitter and other online forums, and should have been easily discoverable for Defendant given his reputation as one of the top experts in the field researching and identifying false and inaccurate information intended to mislead the public on Twitter .



47.     Defendant responded directly by admitting that when he made the earlier claim implying he could not find any record of Mr. Broughty practicing law, he actually "already had the information," but was "waiting for someone else to tweet it" to avoid being accused of inappropriately sharing his real name on social media, also known as doxxing.



48.     In replying to the Twitter thread, Defendant contended that the other users had not grasped the false suggestion and implication he was making and encouraged them to carefully "reread the thread slowly" in the full context of Tweets in order to fully comprehend the false implications that Defendant purposefully intended to convey in his post from the prior day, as Defendant had acknowledged having actual knowledge of Mr. Broughty's actual name and in turn knowledge that he was a licensed attorney.

49.    To make the point crystal clear, along with the statement, Defendant shared his tweet from the previous day when he made the defamatory inferences. Defendant specifically highlighted the fact that he already knew Mr. Broughty's name at that time and was giving hints to the public that he was not using his real name but an online alias, as most users do.



50.    Defendant's admission that he intentionally searched for Mr. Broughty's online alias to foster the false implication that he wasn't an actual attorney, despite already knowing his legal name, surprised Mr. Broughty, especially given Defendant's status as the foremost expert in researching false and inaccurate information intended to mislead the public on Twitter.

51.    At the time Defendant made the defamatory tweets, he intentionally omitted the fact that he was aware of Mr. Broughty's legal name, thereby promoting the false and defamatory implication that he was lying about his qualifications and ability to practice law.

52.    Other Twitter users reacted to Defendant's confession that he had always known Mr. Broughty's real name and only dropped hints to sidestep directly revealing his identity on social media, an action that could result in the suspension of Defendant's prominent Twitter account.



53.     After Defendant admitted that he was aware of Mr. Broughty's name from the start

and had only feigned ignorance to circumvent Twitter's rules, he presented records that confirmed

his status as an attorney in New York to prove his prior knowledge.

54.     In an uncommon instance of consensus between Defendant, Mr. Broughty, and the

Twitter users participating in the discussion, everyone unanimously acknowledged that "the

information" mentioned by Defendant's tweet, when seen in the full context of the conversation,

undoubtedly refers to Mr. Broughty's legal name, which Defendant had previously obtained but

omitted.

55.     Defendant even concedes this point in his Motion To Dismiss Mr. Broughty's

original complaint, stating at footnote 17 that the "information" referred to in his tweet was indeed

Mr. Broughty's real name: "Bouzy's decision, upon subsequently learning *Plaintiff's real name*, to wait until others published that name so he 'wouldn't be accused of "doxing."'" (*See* Docket Number ("Dkt. No.") 10, at p. 25, n. 17) (emphasis added).

56.     This confirms that Defendant already knew Mr. Broughty's real name and intentionally searched the Court's databases using his online alias in order to knowingly and purposely deceive his audience. This deliberate omission aimed to falsely imply that Mr. Broughty wasn't a licensed attorney, furthering the defamatory narrative.

57.     Defendant persisted in his trend of distributing knowingly false and misleading details about Mr. Broughty's qualifications and professional background to his vast Twitter audience.

58.     Defendant has posted outright falsehoods regarding Mr. Broughty, then later retracted these statements after they had reached their target audience.

59.     Mr. Broughty could not counter these falsehoods as Defendant had blocked him and his followers, preventing them from responding.

60.     In another instance, Defendant acknowledged that Mr. Broughty was indeed a lawyer, but never a prosecutor, thereby insinuating that he had misrepresented his qualifications.



61.    Defendant had already admitted to having Mr. Broughty's "information" (real name), yet he recklessly disregarded the truth and continued to use his prominent Twitter account to imply that Mr. Broughty was lying about his credentials.

62.    Following his previously demonstrated pattern of behavior, Defendant only admitted he lied about Mr. Broughty "never being a prosecutor" after the damaging implication had already reached its intended audience.



63.     Defendant continued this pattern on September 21, 2022, claiming in a tweet that, in the year 2000, Mr. Broughty had tampered with evidence during his tenure as a law enforcement officer when Defendant was working for the City of New York.



64.     This revelation stunned Mr. Broughty, especially since, just a few days earlier, Defendant had tweeted Mr. Broughty's employment history, indicating that he was not serving as a law enforcement officer in 2000, making it impossible for him to plant evidence on suspect as a member of law enforcement.

65.     Just as before, Defendant was already in possession of Mr. Broughty's full name, work history, and credentials, yet still, he knowingly tweeted false statements regarding him with a reckless disregard for their truth, or lack thereof.

66.     On, September 21, 2022, Mr. Broughty, through counsel, transmitted a letter to Defendant by email and FedEx demanding that he cease and desist from defaming him, retract his false claims, and delete any defamatory tweets still online.

67.     After receiving the demand letter and being fully aware that Mr. Broughty was never reprimanded for any misconduct while serving in law enforcement, Defendant implied that he was lying about his record and suggested he had evidence (known as "receipts" online) to prove that he was misleading the public with false information.



**Defendant Claims Mr. Broughty Committed Fraud in His Efforts to Fundraise**

68.     On September 20, 2022, Mr. Broughty initiated a transparent fundraising campaign on Donately, an online crowdfunding platform.

69.     The purpose of this campaign was to secure funds for legal representation, background investigations, research, and retainer agreements with a designated law firm to commence this legal action.

70.     To provide evidence of the appropriate use of these funds, Mr. Broughty produced and made available all receipts of his legal payments, which unequivocally demonstrated that every dollar raised was directed towards its intended purpose.

71.     Seeking to prioritize user-friendliness for his supporters and to harness the extensive visibility of a renowned platform, Mr. Broughty subsequently transitioned his fundraising campaign from Donately to GoFundMe.

72.     The GoFundMe fundraising campaign contained the unambiguous statement: "All funds will be used for the lawsuit BROUGHTY v. BOUZY (2:22-cv-06458). Upon the lawsuit's conclusion, any remaining unused funds will be donated to the Texas Children's Hospital."

73.     Mr. Broughty publicly posted wire transfer receipts of payments from his GoFundMe website to the law firm he retained, offering assurance to donors that their contributions were directly reaching the law firm overseeing the lawsuit.

74.     Defendant took interest in Mr. Broughty's fundraising efforts, monitoring and commenting on its progress regularly.

75.     Starting on September 23, 2022, Defendant, shared screenshots of Mr. Broughty's fundraising campaign which detailed how the funds would be used, and without any substantive evidence, Defendant began to taint Mr. Broughty's efforts by implying that he was putting funds into his own pocket.





76.     On October 6, 2022, apparently unsatisfied with mere implications, Defendant explicitly suggested that Mr. Broughty was deceitfully enriching himself through the funds despite *knowing* that he had transmitted all funds to the law firm handling the action and had provided receipts to that effect.



77.    This escalated further on October 14, 2022, when Defendant conflated an unrelated article about his own dealings with Megan Markle to underscore his earlier implication that Mr. Broughty was a fraud.



78.    On April 5, April 19, and May 25, 2023, Mr. Broughty shared a series of wire transfers to GoFundMe. These transfers provided a full accounting of the funds, including receipts to the law firm specified in the GoFundMe campaign

79.    Notwithstanding the direct evidence at his disposal to the contrary, Defendant began a campaign of spreading false and misleading information to imply that he was committing wrongful or criminal deception intended to result in financial or personal gain.

80.    Defendant, having full knowledge that Mr. Broughty was in full compliance with the terms of the GoFundMe campaign and had supplied receipts to show that the funds were going to its intended purpose, recklessly disregarded the truth and began to claim that Mr. Broughty was committing criminal activity, specifically fraud.

81.    Beginning on April 19, 2023, Defendant published a series of tweets that blatantly implied Mr. Broughty was committing fraud, many of which are reproduced below:

- April 19, 2023: "If someone raises $45,000 and claims it is for FUTURE legal expenses but doesn't disclose that a significant portion of that $45,000 would be used to pay a previous unpaid balance, do you think that is that fraud?"

- April 19: "If it is discovered the person who raised the $45,000 raised the money under false pretenses, should he be reported to the NY Bar and authorities?"

- April 21: "All grifters use the same playbook, and Nathaniel isn't any different. Nate didn't release the invoices showing how much he was billed, nor did he disclose how much money is remaining. Instead, he insults me and then asks for more money. This is starting to smell like fraud…"

- April 21: "Anything besides releasing the invoices from the law firm and disclosing the remaining balance is noise. And the fact he is still fundraising

22

without disclosing that information is disturbing. We both know you lied, Nate. The question now is, is what you did considered fraud?.."

- <u>April 21</u>: "You raised nearly $80,000 and shared screenshots of wire transfers. But suddenly, sharing invoices and telling your donors about your previous unpaid legal bills is a problem? Nathaniel, you are a fraud. Release the invoices/balance info, and tell your donors the truth…"

- <u>May 3</u>: "I am not a lawyer, but if someone claims they are raising money for future legal expenses but uses the funds for an undisclosed past-due legal bill, that sounds like fraud to me. Why would Nathaniel share the wire transfers but refuse to share the invoices?.."

82.    Defendant continued to imply that Mr. Broughty was committing fraud despite possessing evidence directly and definitively refuting the notion, such as receipts of wire transfers and the explicit terms of Mr. Broughty's GoFundMe page. Defendant not only knew of these sources of information, but he recklessly disregarded them to convey the defamatory implication that Mr. Broughty was committing fraud.

83.    Paradoxically, Defendant himself even published Mr. Broughty's receipts and GoFundMe details on Twitter *himself*, yet he continued to allege that he was defrauding donors.



‹ Post

**Christopher Bouzy (spoutible.com/cbouzy)**
@cbouzy

Note: Nathaniel Broughty deleted his first fundraiser after raising over $32,000. Nathaniel raised approximately $80,000 in total but hasn't been able to show a full accounting of how he spent the money.

pages.donately.com/natethelawyer/...

11:24 AM · May 25, 2023 · 3,255 Views



← Post

**Christopher Bouzy (spoutible.com/cbouzy)**
@cbouzy

⚠️ Has Nathaniel Broughty (NateTheLawyer) explained where the $4,586.96 from his second fundraiser went yet? He showed he sent $41,360.04 to his lawyer but nothing since March.

💰 Raised: $47,282
💳 GoFundMe fees: $1,335
⚖️ Legal fees: $41,360.04
💸 Missing: $4,586.96

11:24 AM · May 25, 2023 · 40.7K Views

31 Reposts   1 Quote   183 Likes   3 Bookmarks



**Christopher Bouzy (spoutible.com/cbouzy)** @cbouzy · Apr 20

Replying to @cbouzy

His donors believe he has $41,000+ to amend his complaint, appeal, or use the funds for discovery. That is just not true, and he must disclose how much he has left. Failure to do so could be problematic.

💬 8    🔁 16    ❤️ 168    📊 17.9K    ⬆️

84.     Defendant persisted in alleging that Mr. Broughty was misappropriating donor funds and committing fraud, as evidenced by his continued tweets.

85.     Despite being fully aware of the GoFundMe campaign details and the receipts that verified Mr. Broughty's compliance, Defendant recklessly ignored the truth. He not only implied but also outright claimed that Mr. Broughty was fraudulently misusing funds and not following the campaign's stipulations.

86.     Compounding the gravity of the situation is the fact that Defendant is widely regarded as a leading authority in detecting and debunking false information online, especially on Twitter. Given Defendant's esteemed reputation as an authoritative source of truthful information on Twitter, his defamatory statements published on Twitter are particularly damaging, insidious, and pernicious.

**FIRST CAUSE OF ACTION**
**DEFAMATION PER SE BY IMPLICATION**

87.     Mr. Broughty hereby reincorporates by reference all prior allegations made in the preceding paragraphs as though they were fully detailed in this section.

88.     Defendant's statements, when read in the context of the entire online conversation as a whole, may reasonably be read to impart the false suggestions, impressions, and implications, that Mr. Broughty is unlicensed as an attorney, practices law without a license, has a criminal record, and has perpetrated fraud.

89.     The false implications made by Defendant concerning Mr. Broughty were published, communicated, and transmitted to third parties.

90.     Defendant's statements at issue, even if they are substantially true, when taken as a whole can be reasonably read to infer the defamatory inference that Mr. Broughty is unlicensed as an attorney, practices law without a license, has a criminal record, and has perpetrated fraud.

91.     Defendant affirmatively endorsed and intended to endorse the defamatory inferences that Mr. Broughty is unlicensed as an attorney, practices law without a license, has a criminal record, and has perpetrated fraud.

92.     Defendant's statements and subsequent admission that he omitted the factual information that Mr. Broughty was a licensed attorney and that he had Mr. Broughty's real name when he claimed the he "already had the information" shows that Defendant recklessly disregarded the truth or knowingly lied.

93.     Defendant's false statements that Mr. Broughty committed fraud in raising funds for his GoFundMe campaign were made knowingly by Defendant, who had the factual information that Mr. Broughty used the funds as intended. Defendant had the receipts, campaign details, and other evidence, yet he recklessly disregarded the truth revealed in those documents.

94.     Defendant intended to convey the defamatory meaning and deliberately cast his statements in an equivocal fashion in the hopes of insinuating these defamatory meanings about Mr. Broughty to his audience of nearly half a million Twitter followers.

95.     Defendant did not just imply defamation: he wholeheartedly endorsed it, as elaborated above. This is especially evident in his subsequent tweets that purposefully spotlighted his knowledge of Mr. Broughty's legal name, licensed attorney status, work history and valid fundraising endeavors.

96.     As a result of this defamation by implication, Mr. Broughty seeks actual damages for reputational injury, compensatory damages, and special damages for lost contracts resulting from the defamatory statements.

## SECOND CAUSE OF ACTION
### DEFAMATION PER SE

97.   Defendant made false claims that Mr. Broughty is unlicensed as an attorney, practices law without a license, has a criminal record, and has perpetrated fraud.

98.   Defendant's false statements have misrepresented Mr. Broughty's honesty, reliability, and credentials as a legal commentator and lawyer. Defendant also falsely stated and suggested that Mr. Broughty engaged in fraudulent fundraising activities and committed crimes.

99.   Defendant published the false statements to third parties knowing that they were false or with a reckless disregard for the truth.

100.   Mr. Broughty has been harmed, and if the harm done to him is not remedied, he will continue to be damaged by Defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### DEFAMATION PER QUOD

101.   Mr. Broughty incorporates the foregoing allegations as if fully set forth herein.

102.   Defendant's statements concerning Mr. Broughty, as outlined above, were and continue to be false.

103.   Defendant's statements concerning Mr. Broughty were published, communicated, and transmitted to third parties.

104.   Defendant made and published the false statements alleged above knowing that they were false or with a reckless disregard for the truth.

105.   Mr. Broughty has been harmed, and if the harm done to him is not remedied, he will continue to be damaged by Defendant's conduct, including by reason of harm to his reputation, loss of income and other harm, in an amount to be determined at trial.

**WHEREFORE**, Mr. Broughty requests judgment as follows:

(a)     To award him compensatory damages to the extent allowed by law in an amount to

be proved at trial;

(b)     To award him punitive damages to the extent permitted by law;

(c)     To order Defendant to retract his false claims and statements about Mr. Broughty

publicly, in a manner at least equal in reach to that by which he published his false

statements;

(d)     To arrange for and purchase corrective advertising in such form and in such

publications and media as shall be determined by the Court;

(e)     To award such other relief and compensation as the Court shall deem just and

equitable; and

(f)     To award Mr. Broughty his attorneys' fees and costs of suit.

## JURY DEMAND

Mr. Broughty demands a trial by jury on all issues triable of right by a jury.

Dated: September 6, 2023                    Respectfully Submitted,
     Newark, New Jersey

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION

By: _____
    Ronald D. Coleman

Ronald D. Coleman (Bar No. 2288835)
Josiah Contarino (Bar No. 5128517)
Anthony J. Fusaro (Bar No. 5982376)
50 Park Place, Suite 1105
Newark, NJ 07102
t. (973) 298-1723
f. (415) 433-1700
rcoleman@dhillonlaw.com

jcontarino@dhillonlaw.com
afusaro@dhillonlaw.com
*Attorneys for Plaintiff*
*Nathaniel J. Broughty*